Commonwealth v. Johnston.

COMMONWEALTH vs. BRYAN R. JOHNSTON.

Hampshire. December 6, 2013. - April 8, 2014.

Present: SPINA, CORDY, BOTSFORD, DUFFLY, & LENK, JJ.

*Homicide. Burglary. Firearms. Mental Impairment. Evidence,* Field sobriety
test, Admissions and confessions, Cross-examination, Redirect examina-
tion, Hearsay, Relevancy and materiality. *Constitutional Law,* Assistance of
counsel, Admissions and confessions. *Due Process of Law,* Assistance of
counsel. *Practice, Criminal,* Capital case, Assistance of counsel, Argument
by prosecutor, Instructions to jury, Admissions and confessions, Opening
statement, Hearsay, Conduct of prosecutor.

At a murder trial, the defendant's counsel was not ineffective in failing to
   object to evidence that the defendant refused to take field sobriety tests at
   the request of police officers twenty minutes after the shooting, where,
   even if counsel had objected to the admission of the evidence, the defend-
   ant would not have been entitled to have it excluded, in that it was offered
   to show that the defendant was not delusional but quite rational and well
   oriented shortly after the shooting [685-686]; likewise, counsel was not
   ineffective for failing to move to suppress all responses the defendant
   made to officers at a house of correction and to staff at a State hospital
   after invoking his right to assistance of counsel, where a motion based on
   an alleged violation of the defendant's right to counsel would not have
   succeeded, in that the defendant did not invoke his right to remain silent
   during the intake procedure at the house of correction, and in that the
   defendant did not have a constitutional right to have a lawyer present dur-
   ing a court-ordered psychiatric interview [686-688].
At a murder trial, the defendant's counsel was not ineffective for failing to
   object to evidence that, while at a house of correction and a State hospital,
   the defendant had refused to answer some questions, where, at the house
   of correction, the defendant had not invoked his right to remain silent, and
   where, at the State hospital, the defendant had been warned and had
   understood that his interviews with hospital staff would not be privileged
   [688-689]; further, counsel was not ineffective for failing to object to
   evidence that, while at a house of correction and a State hospital, the
   defendant had refused to answer other questions on advice of counsel and
   had asked to speak with counsel before answering certain other questions,
   where, although all references to counsel (but not the refusals themselves)
   should have been the subject of a motion to redact, the admission in
   evidence of the defendant's requests to confer with counsel and that por-
   tion of his refusals identified as having been on advice of counsel did not
   create a substantial likelihood of a miscarriage of justice, in that there was
   a direct relationship between the refusal evidence and the defense of lack

of criminal responsibility, the evidence was first introduced by the defendant, the weight or quantum of evidence of criminal responsibility was significant, references to the evidence were not frequent, and the judge gave a limiting instruction immediately after the prosecutor broached the subject of the refusals [689-693].

At a murder trial, the defendant's counsel was not ineffective for failing to object to the prosecutor's opening statement, where there was no impropriety that could have been remedied by objecting; likewise, counsel was not ineffective for failing to object to the prosecutor's redirect examination of an expert witness, where in that redirect examination, the prosecutor clarified a point raised during cross-examination and elicited further information; finally, counsel was not ineffective for failing to object to the prosecutor's closing argument, where a comment during that argument that a defense had been constructed very soon after the shooting was brief and was not unfairly prejudicial. [693-695]

At a murder trial, although the defendant's counsel was negligent in asking an expert witness on cross-examination a question to which counsel did not know the answer, the defendant suffered no prejudice, in that there was strong evidence that the answer was correct and, although counsel thereby lost one opportunity to impeach the expert, counsel impeached him on multiple fronts during his cross-examination. [695-696]

At a murder trial, although the defendant's counsel should have objected to hearsay testimony elicited by the prosecutor during direct examination of an expert witness, no substantial likelihood of a miscarriage of justice arose, where the evidence was largely cumulative of the testimony of six other witnesses; where counsel impeached the expert with statements, testimony, and notes of other witnesses; and where counsel effectively argued the point in his closing argument. [696-697]

The judge at a murder trial did not err in allowing the prosecutor, during cross-examination of an expert witness, to refer to a textbook on mental disorders that had been in the defendant's possession at the time of the shooting but had not been admitted in evidence, where the subject on which the witness was cross-examined (whether the defendant was malingering or faking his mental illness) was medically and legally relevant, and where the prosecutor's cross-examination went to the thoroughness of the witness's examination of the defendant and thus the credibility of his entire opinion as to the defendant's lack of criminal responsibility [697-698]; further, the judge did not err in excluding, during direct examination of that same expert, hearsay statements that the defendant made to him [698].

There was no merit to the criminal defendant's claim that, at trial, certain testimony constituted impermissible refusal evidence in violation of his right not to testify against himself. [698-699]

During direct examination of an expert witness at a criminal trial, the prosecutor did not suggest that she and the witness had more evidence of the defendant's guilt than the jury heard; further, in closing argument, the prosecutor had support in the record for suggesting a motive that the defendant may have had, and the judge had not precluded the prosecutor from pursuing that theory related to motive; finally, any error in the prosecutor's closing argument that the defendant's delusions were a ruse based on popular culture (an argument that had mild support in the record) probably had no appreciable impact on the jury favorable to the prosecutor. [699-700]

At a murder trial, the judge did not err in instructing the jury regarding state of mind [700-701]; likewise, the judge did not err in declining to instruct the jury as requested regarding the consequences of a verdict of not guilty by reason of lack of criminal responsibility, where the judge was not bound to instruct in the exact language of a request, where the instruction given was fair and balanced and explained the commitment procedure following such a verdict, and where the requested instruction was not necessarily an accurate statement of the law [701-703].

There was no merit to the contention that a portion of the model instruction given at a criminal trial on the consequences of a verdict of not guilty by reason of lack of criminal responsibility was error. [703]

At a criminal trial, any error arising from the failure to instruct the jury conformably with *Commonwealth* v. *Berry*, 457 Mass. 602, 617-618 & n.9 (2010), and *Commonwealth* v. *DiPadova*, 460 Mass. 424, 439 (2011), did not create a substantial likelihood of a miscarriage of justice, where the instruction given was very different from the instructions given in those cases, and did not compel a reasonable juror to conclude that a defense of a lack of criminal responsibility would be unavailable in the circumstances; where the defendant's counsel, anticipating this court's decisions in those cases, requested and received an instruction that ameliorated the lack of a specific instruction in conformance with them; and where other important differences existed between the case at bar and those cases. [703-705]

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree to a lesser degree of guilt or to order a new trial. [705-706]


INDICTMENTS found and returned in the Superior Court Department on January 19, 2005.

The cases were tried before *Bertha D. Josephson*, J., and a motion for a new trial, filed on February 17, 2011, was considered by her.

*David J. Nathanson* (*Dan A. Horowitz* with him) for the defendant.

*Steven Greenbaum*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of (1) murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder; (2) armed burglary; (3) possession of a large capacity firearm in the commission or attempted commission of a felony; and (4) possession of a large capacity firearm without a license. He filed a motion for a new trial that was denied without an evidentiary hearing. His appeal from the denial of his motion for a new trial has been consolidated with

his direct appeal. The defendant asserts that the judge erred in several evidentiary rulings, that counsel rendered ineffective assistance by failing to object to inadmissible evidence and by offering inadmissible evidence, that the prosecutor made improper closing argument, and that the judge gave erroneous instructions to the jury — particularly as to the issue of lack of criminal responsibility. We affirm the judgments of conviction and decline to reduce the degree of guilt or order a new trial pursuant to our power under G. L. c. 278, § 33E.

1. *Background.* a. *The offenses.* We summarize facts the jury could have found and reserve other details for discussion of particular issues. The defendant and the victim were members of a large circle of friends who had graduated from the same high school in June, 2000, and remained close. Both men attended a friend's wedding in June, 2004. The defendant became drunk and told the victim's girl friend that her brother was taking drugs. This upset her, and she asked the victim if what the defendant told her was true. The victim confronted the defendant. The details of the conversation are not certain.

The defendant telephoned the victim at about 10:30 P.M. on December 6, 2004, and invited him to go out drinking. The victim declined and the conversation did not end well. Few details of the conversation are known. A few minutes later the victim told his girl friend that the defendant "[was not] the same anymore." At about the same time a woman who lived in an apartment directly above the defendant's apartment heard angry shouting and cursing coming from the defendant's apartment. It sounded as if it were taking place during a telephone call.

Shortly thereafter the defendant drove approximately thirty-one miles from his apartment in Westfield to the house in Amherst where the victim lived. At about 12:20 A.M. on December 7, the defendant entered the house. He had been there many times. He walked upstairs to the victim's bedroom with a rifle and fired six hollow-point bullets into the victim, killing him. A roommate of the victim, the only other person in the house, heard the gunshots but he did not see the shooter. He telephoned 911 and Amherst police arrived within minutes.

On his way back to Westfield the defendant stopped in the vicinity of a restaurant in Hadley. He disposed of the rifle in a

wooded swampy area. As he was leaving he drove over a log, immobilizing his car. A snow plow operator stopped to help. The defendant said he had been drinking and did not want the police to come. The operator applied his own strength while the defendant worked the car's engine, but they were unable to free the car. The defendant asked the operator to use his truck, but the operator declined and drove off.

At about 12:45 A.M. two Hadley police officers driving separate police cars were dispatched to the area of the restaurant. They observed the defendant's disabled car and stopped. The defendant approached one officer and said that his car was stuck and he needed help to free his car. He added that he had come from a friend's house and had stopped to urinate. The officers detected a mild odor of alcohol on the defendant's breath. His eyes were glassy and mildly bloodshot. When asked if he had been drinking the defendant said that he had consumed some alcohol much earlier that evening, but was fine at that time. The defendant said that he was a Springfield police officer, but later clarified that he was a special police officer at Baystate Medical Center (Baystate) in Springfield. One of the officers had worked at Baystate and telephoned a night supervisor there. He learned that the defendant was not a Baystate special police officer but a patrol officer. When he confronted the defendant with this information, the defendant apologized and said he had taken the test to become a Baystate security officer (the next position above patrol officer) and in his mind he thought he had the job.

When asked to perform a series of field sobriety tests the defendant said that one of his college professors told him that field sobriety tests were illegal, so he was unwilling to perform them at that time. The defendant asked if he was going to be arrested. He was told that he would not be arrested, but that the officers needed to have him take a series of tests to determine if he was capable of driving his car safely. The defendant agreed. After administering one field sobriety test and based on their other observations of the defendant, the officers determined that he was too impaired to drive safely. Arrangements were made to have the defendant's car towed away. The defendant was allowed to telephone a friend (a security officer at Baystate) who arrived and drove him to Westfield.

At 12:58 A.M. on December 7, 2004, while he was waiting for his friend to arrive and drive him to Westfield, the defendant left a voice message for a female friend. He apologized for missing her call and said he was "wondering what you're up to tonight." He spoke in his typical "calm, easygoing, fun-loving . . . nonchalant" tone.

As the defendant's friend was driving him home from the restaurant the defendant said, "It's a good thing the cop didn't search me. . . . I have my piece on me." The defendant produced a handgun and said there were six rounds in it. He also said that his license to carry a gun had been revoked.

As a result of a telephone call the defendant made to his parents at about 4:45 A.M. on December 7, they drove from Boston to Westfield and initiated civil commitment proceedings against him. At about 9 A.M. the same day two Westfield police officers went to the defendant's apartment and asked him to accompany them to Noble Hospital in Westfield for a psychiatric evaluation that was ordered by a District Court judge pursuant to G. L. c. 123, § 12, on the application of his parents. The defendant refused to comply and a struggle ensued. The defendant was subdued through the use of pepper spray.

In the meantime, Amherst and State police investigators were given the name of the defendant by the victim's girl friend. They went to the defendant's apartment in Westfield and were made aware of the defendant's civil commitment. The defendant's father consented to a search of his own car, which contained some items he and his wife had removed from the defendant's apartment for their son's safety, including a .38 caliber handgun. The defendant's father also consented to a search of the defendant's apartment. Among the items recovered from the two locations were a .223 caliber magazine having a capacity of ninety rounds, and a loaded .40 caliber Sig Sauer pistol. The next day, December 8, investigators returned to the defendant's apartment with a search warrant. They recovered several items, including a "fanny" pack containing hypodermic syringes and bottles of two different anabolic steroids. From a Dumpster at the apartment complex, investigators also recovered a gun case capable of holding a rifle.

During a search of the wooded swampy area near the Aqua

Vitae restaurant on December 9, police recovered a .223 caliber Colt model CAR-A3 semiautomatic rifle, one live round of ammunition found near the rifle, and a forty-round magazine. Two latent fingerprints found on the rifle matched those of the defendant. Deoxyribonucleic acid (DNA) testing of blood found on the defendant's jeans matched the DNA profile of the victim.

Trial counsel told the jury in his opening statement that the defense was lack of criminal responsibility. The Commonwealth's theory was that the defendant did not suffer from a mental illness, and any delusions he ever experienced were the result of substance abuse. The Commonwealth also focused upon the absence of any evidence of delusional thinking on the part of the defendant in the hours before and approximately one hour after the killing.

b. *History relevant to criminal responsibility.* A great many of the issues in this appeal involve the subject of criminal responsibility. Rather than recite facts that the jury could have found in returning a verdict of guilty, it is more useful to offer a summary of the evidence relevant to criminal responsibility.

The defendant was a regular user of alcohol and drugs in high school, as were many of his friends. After high school the defendant attended Hawaii Pacific University. His substance abuse continued, and he began experiencing delusions and hallucinations. In December, 2000, during the holiday break after his first semester, the defendant told his father he wanted to move out of the dormitory and get his own apartment. He reported that a roommate's father was involved with the Chicago mafia, and it made him feel uncomfortable.

The defendant's sister visited him at college in the fall of 2001. He told her not to answer his telephone because it was "bugged." He reported that Federal Bureau of Investigation (FBI) agents had rappelled off the roof of his apartment complex and observed him from the window of his twenty-seventh floor apartment. This caused him to keep his curtains closed. In addition, he informed his sister that a next door neighbor had watched him through the walls, and that a pizza shop in the commercial space of his apartment building was run by the mafia.

In January, 2002, a friend (the brother of the victim's girl friend) visited him at college. The two men spent most of their

time together drinking alcohol and taking drugs. By April, 2002, the defendant left Hawaii in haste and refused to return. When his family suggested they go back to Hawaii to retrieve his belongings, he said they could not do that because their lives would be in danger. He explained that he had to leave because various ethnic mafia groups and gangs (he mentioned the "Bloods") were going to kill him and his family. The defendant began taking steroids to help protect himself and his family. He wanted people to fear him because he felt vulnerable. After he left Hawaii his family and friends did not recognize the defendant as the same person they once had known. He rejected his father's request that he see a psychiatrist.

In September, 2002, the defendant enrolled at Westfield State College (now University) as a criminal justice major. He moved out of his parents' home and took an apartment in Westfield. His professors recalled him as being friendly, highly competent, intelligent, and well respected by his peers. They did not observe any unusual behavior or comments. On October 19, 2002, the defendant walked into the State police barracks in Westfield and claimed people were chasing him. A State police officer tried to reassure him that no one was in the parking lot. The defendant would not accept the officer's assertions as true, and he dialed 911. The defendant's state of agitation did not abate, so the officer telephoned the defendant's father and then handcuffed the defendant to a bench for safety purposes. After his father arrived the defendant was released. The defendant told his father that he had visited a friend in the Albany, New York, area and was followed by the mafia on his drive back to Westfield.

The defendant refused an offer to move into the victim's apartment in Amherst because he believed that the victim was a crime family boss and that a great many of their group of friends were involved with organized crime. He also reported that the victim had told him that his crime family had paid to have the defendant anally raped in Hawaii, and that they "bugged" his apartment in Hawaii and his parents' home. The defendant claimed to have seen the victim at Westfield State College the day before the murder. The victim walked out of a class (where he was not a student), smiled eerily at the defendant, and said, "I can get you whenever I want."

In November, 2003, the defendant obtained employment as a security officer at Baystate. He was considered polite and very reliable. He was well liked. The defendant dealt with gang members there without displaying or expressing any fear of them.

On at least five occasions between November, 2003, and mid-November, 2004, the defendant brandished a firearm when he was in the company of his friends. Each occasion involved a different friend. In several of those instances he fired his gun at an inanimate object. In several instances he pointed his gun at the friend. On at least two occasions he alluded to a belief that the friend was involved with organized crime. On at least one occasion he acknowledged that alcohol had brought on his behavior.

The defendant experienced paranoid delusions both when he was intoxicated or on drugs, and when he was sober. He was not always delusional when intoxicated or on drugs. His delusional fear of organized crime families and of gangs intensified during the six months preceding the victim's death.

In July, 2004, the defendant began psychiatric treatment with Dr. Richard Berlin. Lexapro, an antidepressant, provided modest relief. However, by October, 2004, the defendant presented with increasing anxiety. By November, 2004, he was sweaty and tense. He reported weekly panic attacks and "out of body" experiences.

Approximately four hours after the murder, at 4:45 A.M. on December 7, 2004, the defendant telephoned his parents. He was making no sense, talking about the mafia and gangs, and threatening to commit suicide. At 6 A.M., his sister, a psychiatric nurse, returned a telephone call she had received from him. He made no sense. When his parents arrived at his apartment at 8 A.M., he was saying bizarre things and his eyes were unfocused. As mentioned earlier, Westfield police officers served a commitment order on him later that morning. He was taken forcibly to Noble Hospital in Westfield, where he was placed in four-point restraints and sedated. A toxicology screen was negative for cocaine and amphetamines.

c. *Expert testimony.* The defendant presented the opinion

testimony of two experts: Dr. Carol Feldman, a forensic psychologist, and Dr. Martin Kelly, a forensic psychiatrist.

Dr. Feldman opined that, at the time of the killing, the defendant suffered from the mental illness paranoid schizophrenia and, although he generally appreciated the wrongfulness of killing, he lacked substantial capacity to appreciate the wrongfulness of killing the victim, and he was unable to conform his conduct to the requirements of the law. She explained that the defendant believed he was being persecuted by several organized crime groups, and he believed himself to be the prisoner of the victim. She had interviewed the defendant six times, describing one interview in which the defendant's facial color deepened to purple, his tone was emotionally intense, and he was "floridly psychotic" as he described circumstances that caused him to flee Hawaii, namely, persecution by organized crime. Dr. Feldman determined that the defendant had experienced hallucinations in which he heard voices of people intending to kill him, and delusions of being subjected to surveillance.

Dr. Kelly testified that the defendant lacked criminal responsibility due to a paranoid delusional disorder. He described the defendant's illness as an "extensive belief system about the world and particularly about certain forces having evil intent . . . to harm and to kill him and his parents." Dr. Kelly indicated that the disorder does not go into remission without medication, and that the intensity of the defendant's delusions had abated somewhat because he had been placed on a relatively low dose of Risperdal, an antipsychotic medication. Unlike paranoid schizophrenia, a paranoid delusional disorder is not characterized by a decline in functioning, which explains his capacity to work at Baystate and attend college. Both disorders tend to onset between the late teens and mid-twenties.

Dr. Kelly ruled out cocaine and alcohol intoxication as the cause of the defendant's delusions. He also opined that cocaine could not have played a part in the killing because the toxicology screen done at Noble Hospital approximately twelve hours after the shooting was negative for cocaine and amphetamines, a reliable basis to exclude recent cocaine use.

Dr. Kelly also ruled out "ecstasy," an amphetamine the defend-

ant was known to use, as a cause of the defendant's delusions. Amphetamines, he said, do not cause systematized delusions such as the defendant's, and psychosis is a very rare complication of amphetamine use. But even if the defendant had experienced the rare psychosis induced by amphetamines, the symptoms typically disappear after a few days, or after weeks or months at most. They do not persist for fifteen months, the duration of the defendant's psychotic symptoms after the shooting.

Dr. Kelly opined that alcohol did not cause the defendant's delusions. He noted that the defendant experienced his delusions when he was sober (e.g., during his sessions with Dr. Berlin), as well as when he was drinking.

The Commonwealth's expert in rebuttal, Dr. Michael Welner, a forensic psychiatrist who also was board certified in psychopharmacology (the science of treatment of psychiatric conditions with medication and physical treatment), testified that the defendant did not suffer from a major mental illness. He ruled out paranoid delusional disorder because the defendant had reported to Dr. Berlin that his symptoms were not worsening or intensifying.[1] He also considered that the defendant did not report persecutory or delusional behavior on the job[2] or at school, and that up to the night of the shooting the defendant continued to be sociable, even though his friends avoided him.

Dr. Welner opined that the defendant's hallucinations originated from his drug use, and not from mental illness. He explained that psychiatric illness is primarily associated with auditory hallucinations, not visual hallucinations. When a person has visual as well as auditory hallucinations, the indication is that they are drug induced.

Dr. Welner cited the defendant's ability to mislead Hadley police officers about where he had been and his concerns about

[1]However, Dr. Berlin's notes indicate that the defendant was "more sweaty [and] tense than self-report," and that on October 1, 2004, the defendant's anxiety level had risen.

[2]On October 2, 2004, the defendant went out socially with some coworkers at Baystate Medical Center. The defendant became delusional about the Central Intelligence Agency and fired a shot into the air with his handgun. He then claimed the mafia was trying to get him for a rape he purportedly committed. The record shows that he did not commit rape. He later apologized and attributed his behavior to alcohol.

their presence as evidence of his ability to appreciate the wrongfulness of his conduct.

2. *Claims of ineffective assistance of counsel.* The defendant advances six claims of ineffective assistance of counsel, as follows.

a. The defendant's first claim of ineffective assistance of counsel asserts that trial counsel failed to object to evidence that the defendant refused to take field sobriety tests at the request of Hadley police twenty minutes after the shooting. Contrary to the defendant's assertion that he made a "flat" refusal and thereby invoked his right to remain silent, he merely stated that a college professor of his said they were illegal, and he "wasn't willing to do it at that point." The defendant asked if he was going to be arrested. The officers said they were not going to arrest him, but that they would have to administer some tests to make sure he was capable of driving his car. The defendant said he was willing to cooperate, and one field sobriety test was administered.

The officers had been dispatched to the scene; they did not just happen upon it. The defendant's car was protruding onto the highway. Their primary focus on arrival was to "clear the hazard and make sure we get him out of there safely." This was essentially a community caretaking function. See *Commonwealth* v. *Murdough*, 428 Mass. 760, 761-762 (1999). Within that framework, they were entitled to consider likely criminal violations, but they never acted beyond that realm. Both officers had determined that they did not have probable cause to arrest the defendant, and told him so. Moreover, as the prosecutor developed the testimony of the officers, neither she nor the officers used the term "refusal" to take field sobriety tests. The incident was portrayed as an exercise of the community caretaking function.

Contrary to the defendant's view of the case he did not refuse to take field sobriety tests; he did not agree to take just one field sobriety test and refuse others, as in *Commonwealth* v. *Grenier*, 45 Mass. App. Ct. 58, 60 (1998); and he did not invoke his right to remain silent. Indeed, he did a considerable amount of talking, including falsely describing himself first as a Springfield police officer, then as a special police officer at Baystate. He then

offered multiple explanations for his misrepresentations. He also admitted drinking earlier in the evening, but insisted that he was not under the influence at that time. His agreement to submit to field sobriety tests was not the subject of a "Catch-22" situation, as he argues. That is, he was not placed in the dilemma of taking the field sobriety tests and perhaps producing potentially incriminating real evidence; or refusing to take the tests and have adverse testimonial evidence used against him at trial. See *Opinion of the Justices*, 412 Mass. 1201, 1209 (1992). Here, if he took the tests and passed, he could drive his car home. If he did not take the tests or if he took them and failed, he could not drive his car home. Either way, there would be absolutely no risk of self-incrimination. As it happened, he failed and had to call a friend to drive him home. The evidence was offered to show that the defendant was not delusional but quite rational and well oriented twenty minutes after the shooting. It was relevant to his state of mind. Had trial counsel objected, he would not have been entitled to have the evidence excluded. Consequently, the defendant has not shown that counsel was ineffective. See *Commonwealth* v. *Comita*, 441 Mass. 86, 91 (2004).

b. The defendant next claims that trial counsel was ineffective for failing to move to suppress all responses the defendant made to officers at the Hampshire County house of correction on December 9, 2004, and at Bridgewater State Hospital from December 10, 2004, to January 6, 2005, after invoking his right to assistance of counsel. Records from the house of correction indicate that during a medical intake procedure on December 9 the defendant refused to answer questions on advice of counsel. On December 10, a psychologist approved by the Department of Mental Health interviewed the defendant at the request of the Hampshire County sheriff. Trial counsel attended the interview. The defendant presented as depressed and suicidal. He reported having experienced hallucinations on prior occasions, but not on that day. He stated that he would not inform staff at the house of correction if he was close to harming himself. As a result, the psychologist determined that the defendant was in need of hospitalization due to mental illness, and he filed a petition with the Northampton Division of the District Court Depart-

ment the same day seeking commitment of the defendant to Bridgewater State Hospital for up to thirty days, pursuant to G. L. c. 123, § 18 (*a*). A judge in the District Court issued an order of commitment on December 10.

It is important to understand what is not being argued. The defendant does not argue that he invoked his right to remain silent. Although the defendant refused to answer questions on advice of counsel during the medical intake procedure at the house of correction, this was not an invocation of the right to remain silent. The defendant merely set limits about what he was willing to discuss. Similarly, the records of Bridgewater State Hospital indicate that the defendant refused to answer some questions on advice of counsel, but he did not refuse to answer all questions. He answered many questions concerning his current levels of anxiety and thoughts of suicide. Thus, he did not exercise his right to remain silent, an argument unsuccessfully raised below but wisely not pursued on appeal. The privilege against self-incrimination does not include the right to exclude from evidence the refusal to respond to particular or select questions. See *Commonwealth* v. *Womack*, 457 Mass. 268, 276-278 (2010). However, the defendant's statements to staff at the hospital were admissible only as to the defendant's mental or emotional condition. See G. L. c. 233, § 20B (*b*).

The defendant instead focuses on the right to counsel under the Sixth Amendment to the United States Constitution, which attached at the time of his arraignment on the complaint that issued in the District Court. See *Commonwealth* v. *Ortiz*, 422 Mass. 64, 67 n.1 (1996). He argues that his refusal to answer questions on advice of counsel were assertions of his right to assistance of counsel which required hospital staff to refrain from talking to him.

The Sixth Amendment applies to all critical stages of a criminal proceeding. See *Commonwealth* v. *Trapp*, 423 Mass. 356, 358, cert. denied, 519 U.S. 1045 (1996). The decision to order a psychiatric interview for purposes of criminal responsibility is a critical stage to which the right applies, but the resulting interview is not. A defendant does not have a Sixth Amendment right to have his lawyer present during the court-ordered psychiatric interview. *Id.* at 359, citing *Estelle* v. *Smith*, 451 U.S. 454, 470

& n.14 (1981), and *United States* v. *Byers*, 740 F.2d 1104, 1118-1121 (D.C. Cir. 1984). Passing on the question whether a hearing under G. L. c. 123, § 18 (*a*), is a critical stage of a criminal proceeding, the court-ordered interview is not. The defendant had no Sixth Amendment right that required hospital staff to refrain from interviewing him or to terminate interviews with him until counsel was present.

In order to succeed on a claim of ineffective assistance of counsel based on the failure to file a motion to suppress evidence, the defendant must show that he would have prevailed on such a motion. See *Commonwealth* v. *Comita*, 441 Mass. at 91. Such a motion, based on an alleged violation of the defendant's Sixth Amendment right to counsel, would not have succeeded. Consequently, counsel was not ineffective.

c. The defendant next asserts that counsel was ineffective for failing to object to evidence that while at the house of correction and at Bridgewater State Hospital he had refused to answer some questions, that he had refused to answer some questions on advice of counsel, and that he had asked to speak with counsel before answering certain questions.[3]

We first address the issue of testimony concerning his refusal to answer questions. With respect to the conversation at the medical intake interview at the house of correction, although the defendant refused to answer select questions on advice of counsel, as discussed above, he had not invoked his right to silence. Similarly, where the defendant answered some questions at Bridgewater State Hospital, his refusals to answer select questions put to him by staff at the hospital did not constitute an invocation of his right to remain silent. There is no dispute that the defendant had been warned that his interviews with

---

[3]The handwriting in the various reports is difficult to decipher, but it appears that the defendant refused to answer some questions on advice of counsel once at both the house of correction and Bridgewater State Hospital. The Bridgewater records indicate he refused to answer some questions on several occasions, without any reference to counsel. The Bridgewater records also indicate that he refused to answer certain questions on at least twelve occasions, stating he first wanted to speak with counsel. These refusals to answer commenced on December 10, 2004, the date of his admission, and continued until December 21, 2004, when trial counsel attended an interview with the defendant and hospital staff.

hospital staff would not be privileged, and that he understood the warning. See *Commonwealth* v. *Lamb*, 365 Mass. 265, 270 (1974). Consequently, all statements made by the defendant to psychotherapists at Bridgewater State Hospital, including his refusals, are admissible (only) on issues involving his mental or emotional condition.[4] See *Commonwealth* v. *Benoit*, 410 Mass. 506, 518-519 (1991). See also G. L. c. 233, § 20B (*b*).

We turn now to the defendant's references to his lawyer. The first is his refusal to answer certain questions on advice of counsel. The second is his request to confer with counsel before answering certain questions. The fact that the defendant refused to answer certain questions on advice of counsel is entitled to no greater protection than unadvised refusals to answer. However, the portion of the refusals that are identified with the advice of counsel is protected, as is the defendant's request to confer with counsel before answering. All references to counsel, but not the refusals themselves (he did not invoke his right to silence), should have been the subject of a motion to redact.

"The fundamental character of the right of a person accused of a serious crime to have the *aid and advice of counsel . . .* is a right upon which the essential element of fairness in the administration of justice depends" (emphasis added; citations omitted). *Guerin* v. *Commonwealth*, 339 Mass. 731, 734 (1959). Although the defendant was not entitled to have counsel present during the psychiatric interviews, his requests to confer with counsel are not a proper subject for comment. They " 'are not competent testimony against' him." *Commonwealth* v. *DePace*, 433 Mass. 379, 384 (2001), *S.C.*, 442 Mass. 739 (2004), quoting *Commonwealth* v. *Sazama*, 339 Mass. 154, 158 (1959). See *Commonwealth* v. *Person*, 400 Mass. 136, 141 (1987). They may, however, be admissible to explain why a particular interview ended, or explain why certain information that customarily is requested as a matter of sound medical practice is absent

---

[4] If a defendant raises a defense of lack of criminal responsibility and offers expert testimony based on statements of the defendant as to his or her mental condition at the time of the alleged crime, the refusal to submit to a court ordered examination under G. L. c. 123, § 15, may result in the admission of evidence of such refusal to submit to examination. See Mass. R. Crim. P. 14 (b) (2) (B) (iv), as appearing in 442 Mass. 1518 (2004); *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 769 (1977).

from the file. See *Commonwealth* v. *Habarek,* 402 Mass. 105, 110 (1988), *S.C.,* 421 Mass. 1005 (1995). Stymied by the defendant's refusals and desirous of determining if he was a suicide risk, hospital staff reached out to counsel, who attended two interviews with the defendant and hospital staff on December 21 and 23, 2004. The records indicate those interviews went well. No refusals to answer or requests to confer with counsel before answering appear thereafter in the hospital records. Indeed, the defendant was later interviewed for seventy minutes, without counsel, on January 6, 2005.

We next inquire whether the admission in evidence of the defendant's requests to confer with counsel and that portion of his refusals identified as having been on advice of counsel created a substantial likelihood of a miscarriage of justice. We need not concern ourselves with which party was at fault. See *Commonwealth* v. *Wright,* 411 Mass. 678, 682 (1992). When determining error of this type we consider five factors: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or the quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). *Commonwealth* v. *Mahdi,* 388 Mass. 679, 696-697 (1983).[5]

Applying the first *Mahdi* factor, the prosecutor used refusal evidence to rebut the defense that the defendant was delusional at or shortly after the time he committed the murder. This established a direct relationship between the refusal evidence and the defense of lack of criminal responsibility.

As to the second *Mahdi* factor, evidence of the defendant's refusals on advice of counsel and his requests to confer with counsel were first introduced by the defendant during the direct examination of Dr. Kelly, without objection or motion to strike. Trial counsel then moved to admit the report of Dr. J. Leonard

---

[5]We consider the factors set forth in *Commonwealth* v. *Mahdi,* 388 Mass. 679, 696-697 (1983), whether evidence of a defendant's refusal was admitted over objection and we apply the harmless error standard, see *Commonwealth* v. *Peixoto,* 430 Mass. 654, 657-661 & n.6 (2000), or whether refusal evidence is admitted without objection and we apply the unpreserved error standard under G. L. c. 278, § 33E, see *Commonwealth* v. *Brown,* 449 Mass. 747, 763 (2007).

Peebles, a psychologist at Bridgewater State Hospital, prepared pursuant to G. L. c. 123, § 18 (a), as well as the Bridgewater State Hospital medical records, with no request to redact references to the defendant's refusals on advice of counsel or requests to confer with counsel. The decision to introduce these unredacted records was a conscious strategic decision by trial counsel, who had submitted a limiting instruction regarding the defendant's refusals on advice of counsel just before Dr. Kelly testified. Trial counsel later asked that the instruction be given as soon as the prosecutor began to inquire about the defendant's refusals during her cross-examination of Dr. Kelly. The judge gave a substantially similar instruction at that time, as requested. Trial counsel did not object to the prosecutor's cross-examination of Dr. Kelly concerning the refusal evidence. Her purpose was to show that the defendant was not delusional but acting in a reality-based state of mind.

The weight or quantum of evidence of criminal responsibility (not guilt, in this case), the third *Mahdi* factor, was significant. Shortly after the murder the defendant disposed of the murder weapon and cleverly avoided potential problems with the two Hadley police officers who were dispatched to the restaurant. His work supervisor at Baystate testified that he was polite and reliable and capable of handling stressful situations well. A professor from Westfield State College testified the defendant was one of his better students and did not engage in unusual behavior. Friends testified that he appeared normal when sober. He had no prior psychiatric hospitalizations. Dr. Peebles testified the defendant did not show psychotic symptoms while at Bridgewater State Hospital. The evidence of the defendant's refusals on advice of counsel and his request to confer with counsel "played a minor role in the battle of experts on the question of [criminal responsibility], with an enormous amount of personal history, conduct, and [other] material as ammunition for that battle." *Commonwealth* v. *Adams*, 434 Mass. 805, 815 (2001).

Turning to the fourth *Mahdi* factor, the frequency of the reference, house of correction and hospital records indicate references to counsel on fifteen occasions. The prosecutor touched on the refusals approximately five times during her

cross-examination of Dr. Kelly. She never mentioned the refusals on advice of counsel in her closing argument, focusing instead on the absence of any indications of active mental illness while the defendant was at Bridgewater State Hospital. Of significance is the fact that after trial counsel attended interviews at the hospital on December 21 and 23, there were no further refusals. The hospital eventually obtained the defendant's history, which was not appreciably different from the history on which the experts relied or to which the many civilian witnesses related in their testimony.

Regarding the final *Mahdi* factor, the availability or effect of curative instructions, as noted previously, trial counsel had prepared a limiting instruction which the judge gave immediately after the prosecutor broached the subject of the refusals. The judge did not give the precise instruction requested, but she gave one that was substantially similar. She forcefully instructed the jury that the defendant's refusals to answer questions on advice of counsel were "appropriate," and they should "not draw any adverse inference from the fact that somebody has been advised by their attorney not to answer questions," "either because of the advice or because actions were taken pursuant to the advice."

Weighing these factors, we conclude that there was no substantial likelihood of a miscarriage of justice. Trial counsel was able to avoid harmful consequences from improper use of this evidence by virtue of the judge's limiting instruction, which the jury are presumed to follow. See *Commonwealth* v. *Auclair*, 444 Mass. 348, 358 (2005), and cases cited. The limiting instruction also had the salutary effect of eliminating jury speculation that might have arisen from redactions in the records. The prosecutor did not focus upon this evidence, and instead made no reference to it in her closing argument. As the trial judge observed in her decision on the defendant's motion for a new trial, counsel was able to use the refusal evidence and the defendant's requests for counsel "to explain the absence of psychotic statements at Bridgewater while avoiding the potentially adverse inferences that the evidence could also give rise to, e.g., that [the defendant's] compliance with his attorney's advice was evidence of his sanity." In these circumstances we conclude that trial counsel followed a reasonable strategy. We conclude that

there is no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Adams*, 434 Mass. at 815.

d. The defendant's fourth claim that trial counsel was ineffective involves the failure to object to the prosecutor's opening statement where, in describing the chronology of events on the morning of December 7, 2004, she said that "his mother first had spoken to [the family] attorney, . . . [then] contacted the crisis services in Westfield, and the police department was called in to assist in taking him into custody." The defendant contends that the prosecutor was suggesting that the defense was concocted because the defendant and his family consulted lawyers. The defendant further cites a point during the prosecutor's redirect examination of Dr. Welner where she elicited statements of a psychiatrist who treated the defendant at the house of correction to the effect that the psychiatrist advised the defendant that trial counsel was concerned he get treatment for schizophrenia, and that treatment with antipsychotic medication was something trial counsel was urging. Finally, the defendant asserts that the coup de grâce in this impermissible theme of the prosecutor's theory of the case culminated in the prosecutor's closing, where she stated that the defendant's statements in the Bridgewater State Hospital and house of correction records "are evidence of a defense that was constructed very soon after the event."

We begin our analysis with the complaint about the prosecutor's opening, to which there was no objection. The prosecutor did not suggest in her opening that the defense was concocted by the family and their attorneys. She merely laid out a chronology of the expected testimony. The family attorney in fact testified that he spoke to the defendant on the telephone for about fifteen seconds. During that conversation the defendant was agitated, rude, and unresponsive, and walked away from the telephone. The lawyer then made telephone calls to a local crisis team and to the Westfield police department. There was no impropriety that could have been remedied by objecting.

With respect to the prosecutor's redirect examination of Dr. Welner, the nature of the questioning set forth in the transcript is quite different from what the defendant describes. Trial counsel had cross-examined Dr. Welner at length about two separate

incidents at the house of correction in which the defendant assaulted two different inmates, without provocation. Dr. Feldman, the defendant's expert psychologist, had attached considerable importance to the incidents. The defendant reported to Dr. Feldman that he did this because undercover State and Federal law enforcement agents told him it would be his ticket out of the institution if he completed the assault by a specific time of day. Because he was five minutes late, he remained confined. The significance to Dr. Feldman was that the defendant, who had been confined at the house of correction, was sober, yet delusional, at the time of the two incidents with inmates.

During his cross-examination on the subject of the inmate incidents, Dr. Welner allowed for the possibility that the defendant was delusional because there was "contradictory information" about the defendant's state of mind and the defendant's account of what happened. Dr. Welner also testified that the available records from the house of correction indicated that the defendant "was demonstrating absolutely no distress or any sign of any other kind of psychiatric symptom or the same anxiety which had in the past . . . driven him to Dr. Berlin's office to seek care for the symptoms that he had associated with those irrational ideas."

When the prosecutor returned to this subject in her redirect examination of Dr. Welner, she attempted to clarify that the source of the "contradictory information" was not internal to the house of correction, but rather was Dr. Feldman, whose opinion on the incidents had been provided to the house of correction staff by trial counsel. The prosecutor further elicited information from the report of a psychiatrist at the house of correction, who expressed the same concerns as Dr. Welner about the inconsistent information. The defendant never mentioned to house of correction staff that he had assaulted the two inmates on the recommendation of undercover agents. The house of correction psychiatric report said, "It is notable that . . . emotionally [the defendant] doesn't present as schizophrenic, and there are concerning inconsistencies in his subjective report [to Dr. Feldman] and observed presentation." Both psychiatrists had, in effect, been compelled to consider the information on which Dr. Feldman had relied, as transmitted by trial counsel. It also bears

mention that at no point in Dr. Welner's summary of his reasons for concluding as he did is there any indication that the defense of lack of criminal responsibility had been concocted.

Finally, the prosecutor's comment in her closing argument about "a defense that was constructed very soon after the event" was directed not at trial counsel, but the defendant's family. The argument occupies about two lines of fifty-three transcript pages of a closing argument that otherwise was focused on a close and careful analysis of the evidence. Trial counsel objected to some portions of the prosecutor's closing argument, but not to this statement. The absence of an objection is some indication that the argument did not land a hard, foul blow, and was not unfairly prejudicial. See *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). We are satisfied that this minor flaw in a closing argument that otherwise was delivered in a way that must have impressed the jury that the case was entitled to their full, thorough, and respectful consideration of all the evidence did not create a substantial likelihood of a miscarriage of justice.

e. The defendant faults counsel for asking Dr. Welner a question on cross-examination, the answer to which he did not know. He asked why the doctor had described the defendant as "moon faced," and thereby attempted to show that Dr. Welner was demeaning the defendant. Dr. Welner responded that the term had medical significance that indicated a manifestation of steroid use that would persist up to one year after cessation of use. The defendant further contends that based on affidavits from Dr. Kelly and Dr. Jeffery Korff, an endocrinologist, submitted in support of his motion for a new trial, the steroids that the defendant used would not cause "moon face" and the symptoms would not have persisted for one year after cessation of steroid use. Thus, he argues, trial counsel's lack of preparation not only failed at impeachment but it produced false and damaging evidence.

The trial judge concluded that although counsel was negligent, there was no prejudice because there was strong evidence that the defendant in fact used anabolic steroids. We agree. Although this was a lost opportunity to impeach Dr. Welner, whose credentials also included board certification in psychopharmacology, that is, expertise in matters that include side effects and

consequences of drugs, the record indicates that trial counsel impeached him on multiple fronts during 270 transcript pages of his cross-examination. Failure to use a particular method of impeachment does not constitute ineffective assistance of counsel. See *Commonwealth* v. *Hudson*, 446 Mass. 709, 715 (2006), quoting *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001).

f. The defendant's final claim of ineffective assistance of counsel is based on trial counsel's failure to object to hearsay testimony elicited by the prosecutor during her direct examination of Dr. Welner. In particular, Dr. Welner summarized written statements provided to him of witnesses that he said gave no indication during the weeks before the alleged murder that the defendant expressed irrational or delusional ideas in the absence of alcohol or cocaine intoxication. Some of the authors of those statements did not testify, and Dr. Welner did not identify them. Dr. Welner also referred to the statement of a person he identified and who did not testify. The statement of the named person indicated that he spoke to the defendant at 9:30 P.M. on December 6, 2004, approximately three hours before the shooting, and the defendant was not delusional. Had there been an objection to such testimony it should have been sustained. Although it was a proper basis for Dr. Welner's opinion testimony, it was hearsay evidence that should not have been elicited during his direct examination. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986); Mass. G. Evid. § 705 (2013).

However, we perceive no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. at 682. The evidence was largely cumulative of the testimony of six witnesses, especially as to the defendant's mental state, and his consumption of alcohol, between twenty-five and forty minutes after the killing.[6] The defendant admitted to the snow plow operator and the Hadley police officers that he had been drinking. Trial counsel impeached Dr. Welner with statements and testimony of one witness to the effect the defendant had experienced delusions when sober. He used the notes of Dr. Berlin to the same effect. Trial counsel stressed these points in

---

[6]There also was testimony from the defendant's father and sister regarding conversations they had with him approximately four and one-half and five hours, respectively, after the shooting in which he was delusional.

his closing argument. He also recalled the incident at the West-field State police barracks where there was no evidence that the defendant was intoxicated, and the testimony of witnesses who said the defendant expressed delusional ideas even when sober. In the circumstances of this case, we are satisfied that the error did not prejudice the defendant in any appreciable way. See *Commonwealth* v. *Jaime*, 433 Mass. 575, 576-578 (2001).

3. *Evidentiary issues.* a. The defendant alleges that the judge erred in allowing the prosecutor, during her cross-examination of Dr. Kelly, to refer to a textbook entitled "The Sociology of Deviant Behavior" found in the rear seat of the defendant's automobile and used in a course that he was taking at the time of the shooting. The book was not admitted in evidence. The defendant argues that because there was no evidence that he had read the chapter on mental disorders that included a discussion on schizophrenia, the specific chapter referred to, this evidence should not have been admitted. See *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 26-27 (1990). The defendant also alleges that the prosecutor unfairly used this evidence to imply that the defendant had specialized knowledge that enabled him to feign schizophrenia.

The prosecutor cross-examined Dr. Kelly on the question whether the defendant was malingering or "faking" his mental illness. Dr. Kelly had ruled out malingering, but he admitted that having specialized knowledge in certain fields could require an evaluator to proceed with great caution before ruling out malingering. He acknowledged knowing that the defendant was enrolled in college as a criminal justice major, knowing that he had taken at least eight courses in or related to his major, including psychology, in which he earned grades ranging from B to A, and knowing he was enrolled in a course entitled "Sociology of Deviant Behavior." Dr. Kelly further acknowledged that he had not explored whether the defendant had acquired any specialized knowledge from these courses that would be relevant to a determination of malingering.

The subject on which Dr. Kelly was cross-examined, namely, consideration of specialized knowledge as it relates to malingering, was medically relevant by Dr. Kelly's own admission, and it was legally relevant. See *Commonwealth* v. *Kappler*, 416

Mass. 574, 584 (1993). The prosecutor's cross-examination of Dr. Kelly on the defendant's specialized knowledge went to the thoroughness of Dr. Kelly's examination of the defendant, and thus the credibility of his entire opinion as to the defendant's lack of criminal responsibility. It was not an attempt to show the defendant actually was malingering, as the defendant argues. There was no error.

b. There was no error in the exclusion of evidence of statements made by the defendant to Dr. Kelly during the direct examination of Dr. Kelly. The statements involved the defendant's descriptions of hallucinations he experienced in Hawaii three years before the shooting. They were offered as proof that the defendant experienced delusional thinking. As such they constituted hearsay and are inadmissible on direct examination of an expert. See *Commonwealth* v. *Cutts,* 444 Mass. 821, 831 (2005), citing *Department of Youth Servs* v. *A Juvenile,* 398 Mass. at 531-532.

There was no unequal treatment of the parties' respective experts, as the defendant argues. Dr. Welner had described the defendant's hallucinations, without objection, as "auditory," based in part on records that had been admitted in evidence. There had been an objection to Dr. Kelly's testimony, and it was properly sustained on hearsay grounds. Dr. Kelly properly expressed his opinion that the defendant suffered from a psychotic delusional disorder and that his delusional belief paranoid system had been in place since about 2001, and was present when he was in Hawaii. The defendant's "right to produce all proofs, that may be favorable to him," as provided in art. 12 of the Massachusetts Declaration of Rights, does not require the admission of hearsay. *Commonwealth* v. *Roman,* 414 Mass. 235, 239 (1993). He was able to elicit the expert opinion he desired from Dr. Kelly. He was not allowed to elicit the hearsay basis for that opinion. There was no error.

c. There is no merit to the defendant's claim that Dr. Welner testified that he had requested various categories of information including the defendant's financial, telephone, and electronic mail records; that they had not been made available; and that this testimony constituted impermissible refusal evidence in violation of the defendant's rights under the Fifth Amendment

to the United States Constitution and under art. 12. See *Commonwealth* v. *Conkey*, 430 Mass. 139, 141-143 (1999), *S.C.*, 443 Mass. 60 (2004) and 452 Mass. 1022 (2008). There was no objection. Dr. Welner's testimony made clear that the request for the information was made to the prosecutor, not the defendant. At the end of this segment of his testimony the prosecutor asked, "You also mentioned that you had requested any Internet communications of the Defendant." Dr. Welner responded, "I was told it was not available." In context, we are satisfied that no reasonable juror would have inferred that the defendant had refused to produce requested evidence. The default clearly was on the prosecutor.

4. *Prosecutorial misconduct.* The defendant accuses the prosecutor of general unfairness in the way she questioned witnesses, specifically, by insinuating that she and Dr. Welner had suggested they had more evidence of the defendant's guilt than the jury heard, by implying motives the defendant may have had for killing the victim where there was no evidence of motive, and by arguing that the defendant's delusions were ruses appropriated from popular culture.

Argument based on facts not in evidence is improper. *Commonwealth* v. *Storey*, 378 Mass. 312, 324 (1979), cert. denied, 466 U.S. 955 (1980), and cases cited. Similarly, it is improper for an attorney, through cross-examination of a witness, to communicate an impression by innuendo that he or she possesses as yet undisclosed information, with no good faith basis for doing so. See *Commonwealth* v. *Christian*, 430 Mass. 552, 561 (2000), overruled on other grounds by *Commonwealth* v. *Paulding*, 438 Mass. 1 (2002). This principle applies equally to direct examination.

The prosecutor's direct examination of Dr. Welner did not suggest that they had undisclosed information of guilt. The prosecutor was demonstrating that Dr. Welner had considered more information than Dr. Feldman and thus was more thorough. This was neither improper nor unfair.

There was record support for the prosecutor's argument that the defendant resented the victim and was enraged at being "disrespect[ed]" by him. Dr. Kelly testified to disrespect being a motivating factor, and there was evidence of two incidents in

which the victim had confronted the defendant and chastised him in the presence of friends. Dr. Kelly also was aware of these incidents. Contrary to the defendant's argument, there also was record support for the prosecutor's argument that one friend testified that people laughed when the victim chastised the defendant during one of the two incidents.

Also contrary to the defendant's argument, the judge did not preclude the prosecutor from pursuing her theory that the defendant was resentful toward the victim because the victim was enjoying a measure of success on most fronts in his life at a time when the defendant was experiencing losses on parallel fronts in his life. The judge merely cautioned the prosecutor that the probative value of any testimony offered in support of that theory would have to outweigh any potential for prejudice. Our review of the record reveals evidentiary support for this portion of the prosecutor's closing argument, and that the corresponding portion of her argument was unemotional, strictly fact-based, and not unduly prejudicial. There was no error.

Finally, the prosecutor's argument that the defendant's delusions were a ruse based on popular culture had mild record support. We perceive the argument as rather weak. It also is somewhat surprising that the prosecutor even advanced the idea in light of Dr. Kelly's exposure of a similar weakness in the prosecutor's suggestion that the defendant's delusions were a recent fabrication. He reminded the prosecutor that the defendant had a history of delusional thinking at least three years prior to the shooting, and stated convincingly that it was highly improbable that the defendant began to concoct a defense of lack of criminal responsibility at that time. Any error in that aspect of the prosecutor's closing probably had no appreciable impact on the jury, at least none favorable to the prosecutor. We also note that there was no objection to this portion of the prosecutor's closing, which is some indication by experienced trial counsel that it did not rise to the level of a foul blow. See *Commonwealth* v. *Toro*, 395 Mass. at 360.

5. *Jury instructions.* The defendant identifies four aspects of the judge's instructions that he alleges created reversible error.

a. First, he argues that the judge gave an unfairly one-sided instruction regarding state of mind. In particular, he cites the

judge's instruction where she told the jury that they could consider evidence of the defendant's relationship with the victim on the question of the defendant's state of mind. The judge identified only one incident, where the victim allegedly disarmed the defendant, but made no reference to the evidence of the defendant's delusions regarding the victim. This, he continues, unfairly singled out evidence that supported the Commonwealth's theory of motive. See *Commonwealth* v. *Sneed*, 376 Mass. 867, 872 (1978).

The defendant has taken the judge's instruction out of context. The instruction was one of several in a series that reviewed various limiting instructions the judge had given during the course of the trial relating to evidence of prior bad acts. She told the jury they could consider evidence of this particular incident, "as all evidence of the relationship between the [victim and defendant], on the issue of [the defendant's] state of mind toward [the victim]," and not as evidence that he possessed a bad character or had a propensity to commit crimes. The instruction did not have the import about which the defendant complains. There was no error.

b. The defendant requested that the judge instruct the jury as to the consequences of a verdict of not guilty by reason of lack of criminal responsibility, as was his right. See *Commonwealth* v. *Mutina*, 366 Mass. 810, 821-822 (1975). The defendant requested a specific instruction based on the model jury instructions used in the District Court, with the following addition or modification:

> "He would not be released unless a finding is made that his discharge would not create a likelihood of serious harm to himself or others. Otherwise, he could spend the rest of his life in a locked facility."

The judge instructed the jury in substantially the same language as the District Court model instruction.[7] She declined to include the modification requested by the defendant. The defendant argues this was error.

---

[7]The judge's instruction on the consequence of a verdict of not guilty by reason of lack of criminal responsibility was as follows:

"If a defendant is found not guilty by reason of [lack of criminal

This court's decision in *Commonwealth* v. *Mutina, supra*, does not prescribe any particular language on the matter. See *Commonwealth* v. *Callahan*, 380 Mass. 821, 827 (1980), *S.C.*, 386 Mass. 784 (1982) and 401 Mass. 627 (1988). A judge is not bound to instruct in the exact language of a request. A judge must carefully explain the applicable law to the jury, but the method and extent of the charge lies in her discretion. *Commonwealth* v. *Kelley*, 359 Mass. 77, 92 (1971). See *Commonwealth* v. *Ward*, 412 Mass. 395, 399 (1992) ("We have no confidence that any particular charge on the consequences of a verdict of not guilty by reason of [lack of criminal responsibility] will provide just the right information to the jury").

Here, the requested instruction is not necessarily an accurate statement of the law. Not every commitment following a verdict of not guilty by reason of lack of criminal responsibility is to a "locked facility." See *Commonwealth* v. *Nassar*, 380 Mass. 908, 917-918 (1980) (least restrictive alternative analysis applies to commitment proceedings). Moreover, the defendant's proposed modification could be misunderstood to accommodate a one-time order of commitment for life. We conclude the judge's instruction allowed for an accurate understanding that the defendant may

responsibility], a Court may order the Defendant to be hospitalized at a mental facility for a period of 40 days for observation and examination. During this observation period, or within 60 days after a verdict of not guilty by reason of [lack of criminal responsibility], the district attorney or other appropriate authorities may petition a Court to commit the Defendant to a mental health facility or to Bridgewater State Hospital.

"If, after hearing, it is proved beyond a reasonable doubt that the Defendant continues to be mentally ill and that his discharge would create a likelihood of serious harm to himself or others, then the Court may commit the Defendant to a proper mental facility or to Bridgewater State Hospital for six months. Thereafter, periodically a court reviews the order of commitment. If the person is still suffering from a mental illness or defect and is still dangerous, he is kept in the facility. If the person is no longer mentally ill and can resume a normal life, he or she is later discharged.

"The district attorney must be notified of any hearing concerning whether the person may be released, and may be heard at any such hearing. However, the final decision on whether to recommit or release a person is made by a judge."

See Model Jury Instructions for Use in the District Court 6.03 (now 9.200).

indeed never be released. Her instruction was fair and balanced, and explained with reasonable clarity the commitment procedure following a verdict of not guilty by reason of lack of criminal responsibility. There was no error.

c. There is no merit to the defendant's contention that the portion of the model instruction on the consequences of a verdict of not guilty by reason of lack of criminal responsibility, as requested by trial counsel and as given by the judge, which requires the Commonwealth to prove beyond a reasonable doubt that the defendant is mentally ill and would create a likelihood of serious harm to himself or others if discharged, is error. In particular, the defendant argues that it eviscerates the so-called *Mutina* instruction because (1) it requires the Commonwealth to take inconsistent positions: it argued at the criminal trial that the defendant *is not* mentally ill, but it must argue at the commitment hearing that he *is* mentally ill, and (2) a jury will, as a result of this inconsistency, conclude that the Commonwealth necessarily will fail to meet its proof at the commitment hearing. We disagree.

The premise at the commitment hearing is that the Commonwealth failed to meet its burden of proof at the criminal trial, and now must accept that failure and use the defendant's successful trial defense against him at the commitment hearing. To borrow from a common metaphor, the defendant's shield is now the prosecutor's sword. There is nothing difficult to understand about this state of affairs. The two proceedings are altogether different, and there is nothing confusing about the Commonwealth's different burdens. As this court said in *Commonwealth* v. *Robbins*, 422 Mass. 305, 312 (1996), a judge's instruction on the consequences of a verdict of not guilty by reason of lack of criminal responsibility, including the burden of proof at a commitment hearing, is not error.

d. The defendant's final claim of error is the judge's failure to instruct the jury, conformably with *Commonwealth* v. *Berry*, 457 Mass. 602, 617-618 & n.9 (2010), *S.C.*, 466 Mass. 768 (2014), and revised by *Commonwealth* v. *DiPadova*, 460 Mass. 424, 439 (2011), that "if the defendant's mental illness *did* reach the level of lack of criminal responsibility even in the absence of his consumption of [alcohol or] drugs, it was ir-

relevant whether he took [alcohol or] drugs knowing that they would exacerbate that condition" (emphasis in original). *Commonwealth* v. *DiPadova, supra* at 437. The defendant's trial was completed before our decisions in *Berry* and *DiPadova* were released, but he is entitled to the benefit of changes in decisional law that are announced after trial and pending his direct review. *Commonwealth* v. *Bray*, 407 Mass. 296, 299 (1990). The defendant did not object to the judge's charge. It had been requested by trial counsel. We review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. at 682.

The instruction given here was very different from the instructions given in both *Berry* and *DiPadova*. Here, the judge instructed that a defendant who "suffers from a mental disease or defect that is activated by the consumption of alcohol or drugs [] that results in the lack of substantial capacity . . . is not criminally responsible." This instruction leaves room for a finding of a lack of criminal responsibility if the mental illness is not *activated* by drugs or alcohol but already is in play. The instruction, therefore, leaves unaddressed the question whether the consumption of alcohol or drugs that aggravate the effects of a mental illness in effect at the time of the crime will negate the defense of lack of criminal responsibility. A reasonable juror would not be compelled to conclude that a defense of lack of criminal responsibility would be unavailable in the circumstances, unlike the jurors in *Berry* and *DiPadova*. Anticipating *Berry* and *DiPadova* somewhat, trial counsel requested that the judge instruct the jury that they could consider whether the defendant's mental condition might have interfered with his ability to understand the effect of his consumption of alcohol or drugs on his mental disease or defect. The judge so instructed the jury, further ameliorating the lack of a *Berry-DiPadova* instruction.

There are other important differences between this case and *Berry* and *DiPadova*. In those cases, all of the experts testified that the defendant was suffering from a mental disease or defect at the time of the murder. See *Commonwealth* v. *Berry*, 457 Mass. at 615; *Commonwealth* v. *DiPadova*, 460 Mass. at 426. Here, the Commonwealth's expert was of the opinion that the defendant was not suffering from a mental disease or defect. In

the other cases, the defendants had lengthy, well-documented histories of diagnosis and treatment for serious mental illness. See *Commonwealth* v. *Berry, supra* at 607-609; *Commonwealth* v. *DiPadova, supra* at 426. That is not true in this case. More significantly, both defense experts in this case had ruled out alcohol and drugs as a trigger or a contributor to the defendant's lack of substantial capacity. There was no evidence or opinion from the defense that the defendant's consumption of alcohol or drugs played any role in the defendant's lack of substantial capacity to appreciate the wrongfulness of his crime or to conform his conduct to the requirements of the law. For the foregoing reasons, we conclude that the absence of a *Berry-DiPadova* instruction in this case could not have created a substantial likelihood of a miscarriage of justice.

6. *Review under G. L. c. 278, § 33E.* The defendant asks us to exercise our power under G. L. c. 278, § 33E, and reduce the degree of guilt or order a new trial. He bases his request on the extensive evidence of mental illness. When we undertake review under § 33E, we do not function as a second jury. *Commonwealth* v. *Smith*, 357 Mass. 168, 181 (1970), *S.C.*, 427 Mass. 245 (1998). That is, we do not determine what verdict we would have returned, but whether the verdict "was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require." G. L. c. 278, § 33E. See *Commonwealth* v. *Brown*, 449 Mass. 747, 773 (2007).

Although the defendant presented substantial evidence supporting his defense of lack of criminal responsibility, the Commonwealth presented substantial evidence to the contrary. It presented evidence that the defendant was not delusional on the evening of the murder: he was concerned about encountering police; he quick-wittedly negotiated his way through his encounter with police at the restaurant; he demonstrated no signs of delusional thinking as his coworker drove him from the restaurant to Westfield; and he demonstrated no signs of delusional thinking while at Bridgewater State Hospital or the house of correction where he was held pending appeal.

The defense of lack of criminal responsibility was fully and fairly presented to the jury. The judge's instructions were

adequate, and the error in the "activation/aggravation" instruction (*Berry-DiPadova*) did not create a substantial likelihood of a miscarriage of justice in light of the defense experts' testimony that alcohol or drugs played no part in their opinions. Unlike *Commonwealth* v. *Berry*, 466 Mass. 763, 771, 774 (2014), where we reduced the verdict to murder in the second degree, this is not a case where every testifying expert agreed that the defendant was mentally ill at the time of the murder, which itself is no assurance of a reduction in the degree of guilt. Tragic as this case is, it is a case where the question of criminal responsibility was truly for the jury, and justice does not require that their verdict be disturbed. See *Commonwealth* v. *Brown, supra,* and cases cited. We see no basis for reducing the degree of guilt or ordering a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*