# United States Court of Appeals
## For the First Circuit

No. 15-2519

DAVID JACKSON,

Petitioner, Appellant,

v.

JOHN MARSHALL,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

Alan J. Black for appellant.
Susanne G. Reardon, Assistant Attorney General, Criminal
Bureau, Appeals Division, with whom Maura Healey, Attorney General
of Massachusetts, was on brief, for appellee.

July 19, 2017

**KAYATTA**, **Circuit Judge**. David Jackson was convicted of first degree murder in Massachusetts Superior Court. The Massachusetts Supreme Judicial Court ("SJC") affirmed his conviction and rejected his collateral challenges. In turn, the United States District Court for the District of Massachusetts denied his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Jackson now appeals, reasserting that his trial was unconstitutionally unfair because the Commonwealth failed to turn over what he views as undisputable evidence that the Commonwealth's chief witness was given inducements in exchange for favorable testimony and because the Commonwealth suborned the witness's perjurious testimony to the contrary. For the following reasons, we find that Jackson has failed to meet the burden imposed on him under § 2254. We therefore affirm.

## I. Background[1]

Jackson's conviction arose out of a robbery and fatal shooting that occurred in April 1990 in an apartment complex in Boston. No physical evidence tied Jackson to the crime. But three months after the crime was perpetrated, the Commonwealth's chief witness, Steven Olbinsky, gave two statements describing the event to the police. In those statements, and then almost three years

---

[1] We present an overview of the facts taken from the background summary given by the SJC. See Scoggins v. Hall, 765 F.3d 53, 54 (1st Cir. 2014).

later at trial, he reported that on the night of the crime, a man named Mark James asked him where to go to purchase drugs; that Olbinsky led James, Jackson, and another unidentified man to the apartment complex; that Jackson drew a shotgun from his vehicle; that Jackson then asked which of the units in the building was the drug dealer's residence; that Olbinsky told Jackson the wrong unit because Olbinsky was frightened; and that Olbinsky departed the scene as Jackson, wearing a trench coat and wielding the weapon, approached the building with James.[2] No one else specifically placed Jackson at the scene of the crime. Other witnesses, though, testified that two men, one in a mask and long jacket and carrying a shotgun, broke into the unit to which Olbinsky had directed Jackson, and were redirected by occupants of that unit to the unit of a known drug dealer. See Commonwealth v. Jackson (Jackson I), 702 N.E.2d 1158, 1160-61 (Mass. 1998). The two men then broke into the latter unit, where one of them fired the shotgun, killing an inhabitant. Another witness testified that later that evening, Jackson and James arrived at another apartment. Jackson was described as wearing a long jacket and carrying a shotgun, jewelry,

---

[2] Jackson does not dispute this description of Olbinsky's trial testimony. Nor does he challenge the SJC's conclusion that "Olbinsky had given consistent accounts of the incident since July, 1990," the date of his first statement to the police. Commonwealth v. Jackson, 702 N.E.2d 1158, 1161 (Mass. 1998). Indeed, in his reply brief, Jackson recognizes that Olbinsky's "story never changed."

money, and cocaine.  The witness testified that Jackson disclosed that he and James had committed a robbery, and that the shotgun discharged accidentally as they were leaving.  Id. at 1161.

At trial, the prosecutor stated that "the Commonwealth . . . is offering nothing to Mr. Olbinsky for his testimony.  There's been no rewards, there's been no promises, there's been no inducements, no offers for his testimony.  If there were, you'd know about it."  Olbinsky also testified that he did not receive any inducements for his testimony.  See id.  In closing argument, in response to Jackson's counsel's suggestion that it was unlikely that Olbinsky was testifying without some kind of quid pro quo, the prosecutor countered by saying that Olbinsky, who had in fact been indicted with Jackson on one count of first degree murder, was "on trial" for the same offense.  The prosecutor told the jury, "I've got the case and if he got a deal, you would have known about it.  Let me repeat that.  You would have known about it."

As Jackson knew, however, Olbinsky was not literally "on trial."[3]  In fact, his case never left the starting gate.  Instead, after Olbinsky's attorney filed a motion to dismiss the indictment for lack of sufficient evidence, the trial court continued his case seven separate times.  The Commonwealth never opposed

---

[3]  Jackson makes no contention that the prosecutor's misstatement entitles him to habeas relief.

Olbinsky's motion to dismiss the indictment, and two weeks after Jackson's trial concluded, the motion was granted.

Convicted on April 16, 1993, Jackson was sentenced to life in prison. He took a direct appeal to the SJC and moved for a new trial pursuant to Rule 30 of the Massachusetts Rules of Criminal Procedure. Among other things, he argued that "the prosecutor impermissibly bolstered the credibility" of Olbinsky "by misrepresenting to the jury that no deal had been made in exchange for Olbinsky's testimony." Id. This claim was "actually two separate claims," first, "that the prosecutor stated that no inducement had been offered for Olbinsky's testimony and that this was false," and second, "that the prosecutor concealed the fact that the Commonwealth did not intend to prosecute Olbinsky." Id. As to the first claim, the SJC found there was insufficient evidence to find the prosecutor's statement false. Id. As to the second, the SJC found that "even if true, [concealing that the Commonwealth did not intend to prosecute Olbinsky] would not have served to bolster [his] credibility." Id. Finding none of Jackson's arguments convincing, the SJC affirmed his conviction and sentence and declined to grant collateral relief. Id. at 1166-67.

Jackson unsuccessfully pursued a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts in 1999. In 2002, he filed a second Rule 30

motion in state court.  In this motion, he claimed to have discovered new evidence that Olbinsky testified subject to inducements.  The new evidence consisted of a bail agreement between the Commonwealth and Olbinsky, which Jackson said he did not know existed until he made a public records request in July 2002.  The agreement, entered on the public docket in Olbinsky's case almost a year before Jackson was tried, provided that Olbinsky would be subject to electronic monitoring and a curfew while out on bail, which Olbinsky had posted three weeks prior, once the trial judge in his case reduced his bail from $25,000 to $5000 cash.

Jackson's motion was denied, and a single justice of the SJC denied leave to appeal that denial on October 23, 2003.  See Mass. Gen. Laws ch. 278, § 33E.  In the denial, the gatekeeper justice noted that the bail agreement to which Jackson referred was readily available long before his trial; the agreement merely provided for electronic monitoring; it did not "shed[] light on what convinced the judge to reduce Olbinsky's bail" or "what position the prosecutor took on that issue at that time"; and it contained "nothing to suggest that [Olbinsky] had anything to fear in connection with the terms of his bail that would have caused him to testify in a manner to please the prosecutor."  In any event, said the gatekeeper justice, "defendant's suggestion that better impeachment of Olbinsky would have accomplished something

- 6 -

meaningful for the defense [was] unpersuasive" because Olbinsky's trial testimony matched statements he gave to police shortly after the crime was committed and long before his arrest, and because it was corroborated by other testimonial evidence.

In May 2004, Jackson moved pursuant to Federal Rule of Civil Procedure 60 for relief from the judgment denying his habeas petition. In this motion, Jackson pointed to the bail agreement as evidence that Olbinsky was incentivized to testify falsely against him. Jackson also claimed that "documents from a criminal trial of Mr. Olbinsky in Oregon suggest[ed] that Mr. Olbinsky's arrest in Massachusetts in connection with [Jackson's] state court trial was intended to lead to an implicit agreement between Mr. Olbinsky and the prosecutor." The district court found that Jackson "potentially [had] a meritorious claim and that the government's alleged hiding of this evidence, if true, would constitute extraordinary circumstances beyond the petitioner's control." Jackson was therefore granted leave under Rule 60(b)(6) to move for an evidentiary hearing.

In his subsequent motion for an evidentiary hearing, Jackson explained the Oregon evidence. Apparently, Olbinsky absconded to Oregon a few months after the shooting. On March 13, 1992, he was indicted with Jackson on a charge of first degree murder. Oregon police arrested Olbinsky pursuant to the Massachusetts warrant, and he was extradited to Massachusetts on

April 16, 1992. Searching his home in an unrelated drug investigation, Oregon police found a quarter-pound of methamphetamine, and Olbinsky was indicted on drug charges in Oregon on June 23, 1992. An Oregon warrant for his arrest issued and he was charged with two counts of manufacturing or delivering methamphetamine (a Class B felony under Oregon law) and one count of possession of methamphetamine (a Class C felony). Olbinsky entered into the bail agreement with Massachusetts prosecutors that same day, and his attorney filed the motion to dismiss his murder indictment for lack of evidence.

Three days later, at the urging of an assistant district attorney in Massachusetts, an Oregon prosecutor requested Olbinsky's Oregon arrest warrant be recalled. The Oregon prosecutor's notes stated that "we're trying to work [with] prosecutors in Boston to treat [Olbinsky] nicely, as he's a material witness in a murder case there." In a tape-recorded proceeding in Oregon, a prosecutor stated: "Because of the Massachusetts prosecutor's need to have this defendant as a witness in the homicide case, we had agreed to have the defendant released, take off our warrant on this offense so that this defendant could be released from custody back in Massachusetts." In June 1996, long after Jackson was tried and convicted, Olbinsky pled no contest and was convicted on the possession charge, and the

manufacturing/delivering charges were dismissed.  He was sentenced only to a term of probation.

The district court denied Jackson's request for an evidentiary hearing but found that Jackson had shown good cause to be permitted to take discovery.  See Jackson v. Marshall (Jackson II), 500 F. Supp. 2d 1, 6 (D. Mass. 2007).  Jackson was allowed to propound discovery of "all documents of whatever name and nature" evidencing "promises, rewards, and inducements given to Olbinsky or on his behalf, including all actions taken in connection with the Oregon proceedings."  Id.  He was also given permission to take two seven-hour depositions of the two Massachusetts prosecutors who had worked the case.

After conducting the allowed discovery, Jackson returned to the district court.  Along with the evidence earlier presented, he submitted his attorney's affidavit describing her conversation in March 2007 with Olbinsky's Massachusetts defense attorney, who she averred stated that Olbinsky "was never anything more than a material witness and that the prosecutor had charged Olbinsky with murder in the first degree because he did not believe that out-of-state authorities would pay attention to a material witness warrant."  Jackson v. Marshall (Jackson III), 634 F. Supp. 2d 146, 150-51 (D. Mass. 2009).  Jackson also submitted the transcripts of the two depositions, which he said revealed "little if anything more than what [he] learned through independent means," because

one of the prosecutors "had only a 'vague memory' of the case, and could not explain how Olbinsky came to be released on bail or why the Commonwealth did not oppose his motion to dismiss the indictment against him," and the other prosecutor "was unaware that Massachusetts prosecutors had asked the Oregon authorities to treat Olbinsky 'nicely,' and could not remember how Olbinsky 'ended up in court.'" Id. at 153.

Because the SJC gatekeeper justice determined that the bail agreement was "readily discoverable" at the time of Jackson's trial, id. at 160, the district court found that Jackson's claim concerning the bail agreement--i.e., that under Brady v. Maryland, 373 U.S. 83, 87 (1963), prosecutors should have informed Jackson of the agreement so he could use it to impeach Olbinsky--was procedurally defaulted. Jackson III, 634 F. Supp. 2d at 159. The district court found no excusable cause for the default, no actual prejudice, and no potential for a fundamental miscarriage of justice, and it therefore denied habeas relief. Id. at 159-62. The district court also found that Jackson failed to give the state courts the opportunity to consider his claim that Brady required the prosecutors to disclose their interventions in Olbinsky's Oregon case. Id. at 156. As to his claim that prosecutors violated his due process rights by supposedly misrepresenting to the jury (and allowing Olbinsky to misrepresent to the jury) that Olbinsky, "not sheltered by any deal, faced murder charges for involvement

in the same crime," the district court found that the claim had been exhausted in the state courts and the SJC had decided its merits, so it was eligible for habeas review under 28 U.S.C. § 2254. Id. at 162-63. With one nondefaulted claim exhausted and the other unexhausted, Jackson's petition was stayed. Id. at 163.

Jackson returned to state court and filed a third Rule 30 motion to exhaust his claim that the Commonwealth violated his due process rights by failing to disclose its intervention in Olbinsky's Oregon case. The state court denied Jackson's motion, but a single justice of the SJC granted Jackson's gatekeeper petition for leave to appeal. The SJC affirmed in a reasoned decision on the merits. See Commonwealth v. Jackson (Jackson IV), 9 N.E.3d 844, 845-46, 849-50 (Mass. 2014). Jackson came back to federal court once more, and the district court rejected both of his remaining claims. See Jackson v. Marshall (Jackson V), 148 F. Supp. 3d 152, 156-57 (D. Mass. 2015). His renewed request for an evidentiary hearing under 28 U.S.C. § 2254(e) was also denied. Id. at 157. This timely appeal followed.

## II. Discussion

### A.

Under Brady, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

- 11 -

373 U.S. at 87. The duty to disclose extends to impeachment evidence. See United States v. Bagley, 473 U.S. 667, 676 (1985). Jackson contends that the prosecution violated Brady and its progeny by failing to disclose either its intervention in Olbinsky's Oregon case or the purported fact that the Commonwealth did not actually plan to pursue the first degree murder charge against Olbinsky. Jackson also contends that the prosecutor violated his constitutional rights by allowing Olbinsky to testify dishonestly that he received no inducements for his testimony and by repeatedly representing to the jury that Olbinsky was not testifying subject to a deal or agreement.[4] The district court, whose decision we review de novo, see Moore v. Dickhaut, 842 F.3d 97, 99 (1st Cir. 2016) (citing Teti v. Bender, 507 F.3d 50, 56 (1st Cir. 2007)), determined that Jackson's claims were exhausted in the state court, the state court adjudicated them on the merits,

---

[4] In addition, Jackson argues that the district court erred in determining that he procedurally defaulted his claim that Massachusetts prosecutors violated Brady by failing to disclose Olbinsky's favorable bail agreement. Jackson does not contest, however, the district court's conclusion that the facts underlying this claim were available to him at trial. He instead offers an undeveloped argument that procedural-default rules should not apply to him because his post-trial motion was made pro se. This argument is waived, see Abrante v. St. Amand, 595 F.3d 11, 19 (1st Cir. 2010) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)), and we are unpersuaded that the district court erred in finding that Jackson procedurally defaulted his Brady challenge based on the bail agreement.

and the state court's decision did not warrant habeas relief under either 28 U.S.C. § 2254(d)(1) or 28 U.S.C. § 2254(d)(2).

Jackson urges us to review the state court rulings de novo. But under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, we are typically required to accord substantial deference to a state court's decision on the merits. With respect to "any claim that was adjudicated on the merits in State court proceedings," id. § 2254(d), AEDPA permits us to grant a habeas petition only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," Williams v. Taylor, 529 U.S. 362, 376 (2000) (opinion of Stevens, J.) (quoting 28 U.S.C. § 2254(d)(1)), or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Only when a petitioner's claims are exhausted in state court but the state court fails to consider them on the merits or resolve them on adequate and independent state law grounds do we review them de novo. See Jenkins v. Bergeron, 824 F.3d 148, 152 (1st Cir. 2016) (quoting Zuluaga v. Spencer, 585 F.3d 27, 30 (1st Cir. 2009)).

Jackson first argues that the SJC did not decide his challenges on their merits because the court did not directly address his argument that the suppressed evidence demonstrates

- 13 -

that the Commonwealth suborned Olbinsky's perjury and therefore requires a new trial based on the lower materiality threshold described in United States v. Agurs, 427 U.S. 97, 103 & n.9 (1976) (citing Mooney v. Holohan, 294 U.S. 103, 112 (1935), and Giglio v. United States, 405 U.S. 150, 153-54 (1972)). This argument misunderstands what an adjudication "on the merits" for AEDPA purposes entails. A state court does not fail to adjudicate a claim on the merits if it assesses the petitioner's claim but applies a legal standard other than the standard petitioner suggests. Cf. Lyons v. Brady, 666 F.3d 51, 54 (1st Cir. 2012) (articulating a presumption that, absent any contrary indication, a state court decision has adjudicated a claim on the merits). Here there is no dispute that the SJC did evaluate, in a reasoned decision on Jackson's third motion for a new trial in 2014, whether Jackson received an unfair trial due to the Commonwealth's failure to disclose the prosecution's interventions in Oregon or the likelihood that Olbinsky's murder charge would be dismissed. See Jackson IV, 9 N.E. 3d at 845-50. These actions and Olbinsky's lenient bail agreement are what Jackson claims demonstrate that Olbinsky testified subject to inducements and lied under oath when he claimed he received none. But as we will explain further below, in determining that no inducements were given, the SJC necessarily found that the prosecution did not suborn perjury. The SJC's decision not to apply the materiality standard described in Agurs

- 14 -

was not a refusal to consider the merits of Jackson's claims, but was rather a choice to apply a different materiality standard based on the facts in the record as the SJC understood them. The question of whether the SJC applied the correct materiality standard when evaluating these claims is one that we review through the lens of AEDPA deference. See Mastracchio v. Vose, 274 F.3d 590, 604 (1st Cir. 2001) (citing Agurs, 427 U.S. at 103).

Jackson next insists that these claims should be granted de novo review because the SJC did not adjudicate them with a full grasp of the record. He contends that because "the prosecution did not disclose its deals with Olbinsky until long after the appeal on [Jackson's] motion for new trial, the SJC rendered its opinion on the clearly erroneous premise that there were no undisclosed promises, rewards [or] inducements." Therefore, he says, we should find that the Brady materials in this case "surfaced for the first time during federal proceedings" and therefore merit de novo review. Monroe v. Angelone, 323 F.3d 286, 297-98 (4th Cir. 2003) (citing Rojem v. Gibson, 245 F.3d 1130, 1140 (10th Cir. 2001), and Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002)).

It is literally true that some of the evidence Jackson relies upon in support of his petition did first surface during federal habeas proceedings. But all of that evidence was eventually presented to the SJC in the course of its collateral

- 15 -

review. Furthermore, the record before us does not support Jackson's claim that the SJC's decision was issued before the prosecution admitted it made "deals with Olbinsky." The Commonwealth's position has always been, and continues to be, that no deal was ever struck with Olbinsky. Thus, unlike cases in which a petitioner clears the hurdle imposed by 28 U.S.C. § 2254(d) and adduces new evidence on habeas review, see Monroe, 323 F.3d at 297; Rojem, 245 F.3d at 1140; Killian, 282 F.3d at 1208, we are constrained to the record presented to the state court, and we must defer to the state court's merits decision on that record.[5]

**B.**

We therefore move to the central question under AEDPA: whether the SJC's decision was contrary to clearly established

---

[5] Nor, finally, do we find cause to abandon this conclusion based on Jackson's claim that the SJC did not actually review all of the evidence presented to it. Jackson argues that this is a necessary inference because the SJC never mentioned the Oregon prosecutor's notes or the tape recording of Olbinsky's Oregon proceedings. But contrary to Jackson's assertions in his briefs and at oral argument, the SJC expressly referenced the prosecutor's notes. See Jackson IV, 9 N.E.3d at 846 ("The evidence include[s] a notation memorializing the basis for recalling [Olbinsky's Oregon] warrant: '[e]vidently we're trying to work w[ith] prosecutors in Boston to treat this [defendant] nicely, as he's a material witness in a murder case there.'" (first two alterations added)). And although not explicit, the SJC's reference to "[a]dditional evidence suggest[ing] the possibility that, after the defendant's trial, Olbinsky's cooperation with Massachusetts authorities may have been a factor in his receipt of lenient treatment in Oregon," id., is consistent with the notion that the SJC did, in fact, consider the tape recording.

- 16 -

Supreme Court precedent or was based on a clearly erroneous view of the factual record.  See 28 U.S.C. § 2254(d).

Jackson does not mount a real challenge on the latter front.  The SJC found the following facts, none of which Jackson seriously disputes:  (1) Olbinsky gave materially identical accounts of the robbery before and after the dates on which inducements were allegedly given, see Jackson IV, 9 N.E.3d at 848; (2) defense counsel impeached Olbinsky on other bases, including his indictment on the same murder charge as Jackson, see id. at 846; and (3) other witnesses gave testimony with details that matched Olbinsky's account, see id. at 850.  Jackson contends that the SJC should not have placed any weight on Olbinsky's matching early accounts, given a few months after the murder, because Olbinsky was under investigation or under indictment for other crimes at the time he gave them.  But Jackson does not elaborate on this contention or explain what those crimes and possible charges were, how they are relevant, whether police or prosecutors offered inducements for Olbinsky's cooperation at the time, or what (if any) evidence Jackson has or believes exists in support of any of these details.

Jackson also protests that the SJC should not have credited the accounts of other witnesses whose highly incriminating testimonies included details that matched Olbinsky's, because those witnesses were unreliable.

- 17 -

Specifically, he points out that the only people who testified to witnessing the crime could not identify him, and the three witnesses who claimed to see him after the crime wearing a trench coat and carrying a shotgun and loot were drug users and addicts, two of whom had criminal records and two of whom admitted they had used cocaine on the date of the crime. Jackson III, 634 F. Supp. 2d at 161-62 n.9. But while Jackson cross-examined those witnesses based on their criminal histories and drug use, he has never developed an argument that their testimonies should have been entirely excluded. It was thus the jury's prerogative to gauge the credibility of the witnesses, and it is our duty to "resolve[] all credibility issues in favor of the verdict." Morgan v. Dickhaut, 677 F.3d 39, 47 (1st Cir. 2012) (alteration in original) (quoting United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995)).

On this record, the SJC determined that Jackson was not entitled to a new trial because there was not a "substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial," Jackson IV, 9 N.E.3d at 847 (quoting Commonwealth v. Tucceri, 589 N.E.2d 1216, 1223 (Mass. 1992)), so the undisclosed evidence did not "cast[] real doubt on the justice of [Jackson's] conviction," id. (quoting Commonwealth v. Grace, 491 N.E.2d 246, 248 (Mass. 1986)). This analysis is akin to the materiality analysis set forth in one line of Supreme Court cases under Brady, which provides that "evidence is material

- 18 -

'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting Bagley, 473 U.S. at 682); see Smith v. Cain, 565 U.S. 73, 75 (2012). In fact, the SJC views its standard under Tucceri as more favorable to petitioners than the prejudice standard imposed under Brady, see McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002), so by finding that the undisclosed evidence did not satisfy the lesser standard of Tucceri, the SJC found, a fortiori, that Jackson was not sufficiently prejudiced for his trial to be deemed unconstitutional under Brady, see Norton v. Spencer, 351 F.3d 1, 5 (1st Cir. 2003). That finding was not clearly erroneous.

Jackson's rejoinder is that the SJC should have applied a different materiality standard because he demonstrated that the prosecutor suborned perjury. Noting that "a prosecutor's knowing inducement of perjury is treated more harshly than a failure, which could be inadvertent, to disclose exculpatory evidence," Perkins v. Russo, 586 F.3d 115, 119 (1st Cir. 2009), Jackson insists that his is the case recognized in Agurs in which "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury," 427 U.S. at 103. He therefore argues that the SJC should have applied a "strict standard of materiality." Id. at 103-04. "[W]hen a prosecutor knowingly uses perjured

- 19 -

testimony, 'a conviction . . . is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Perkins, 586 F.3d at 119 (alteration in original) (quoting Agurs, 427 U.S. at 103). This, says Jackson, is a different and far more petitioner-friendly prejudice standard that the SJC neglected to apply. In effect, Jackson contends that this case is like Mastracchio, in which we found a state supreme court contravened clearly established Supreme Court precedent when it applied the higher materiality standard applicable in exculpatory-evidence Brady cases instead of the lower standard applicable when a witness has committed perjury about which the prosecution knew or should have known. Mastracchio, 274 F.3d at 604.

Unlike Mastracchio, however, this case presents us with a factual record from which the SJC reasonably, if implicitly, concluded that Olbinsky did not perjure himself in denying receipt of prosecutorial inducements. The SJC noted that "Olbinsky . . . testified that he had received no inducements for his testimony." Jackson IV, 9 N.E.3d at 846. It then concluded:

> [E]ven assuming that the Commonwealth requested that Oregon withdraw its warrant so that Olbinsky could remain free on bail in Massachusetts and that, at some point after the defendant's trial, it communicated to Oregon that Olbinsky had given helpful testimony at the defendant's trial, there is no evidence demonstrating that the

> Commonwealth made these efforts to induce Olbinsky's cooperation.

Id. at 848. This is a reasonable interpretation of the record. Neither police officers nor Massachusetts prosecutors, when interviewed and deposed, recalled making any promises whatsoever to Olbinsky. To the contrary, the officers involved swore affidavits stating that they were certain they offered Olbinsky no inducements. And the Oregon prosecutor's notes and the tape of the Oregon proceedings indicated that Oregon officials sought to be "nice" to Olbinsky and release him on bail in Massachusetts, but this is at least as indicative, if not more, of Oregon's interest in cooperating with Massachusetts in its effort to prosecute a significant violent crime as it is of inducement.

By reasonably finding that the record lacked evidence supporting a claim that the Commonwealth interceded in the Oregon proceedings and otherwise treated Olbinsky nicely as consideration for a deal to deliver favorable testimony, the SJC necessarily determined that Olbinsky did not perjure himself by representing to the jury that he was not testifying in exchange for inducements. The SJC therefore did not depart from clearly established Supreme Court precedent when it applied the materiality standard provided in Tucceri.

Second, Jackson contends that the SJC misapplied Brady and its progeny because the facts in this case required the SJC to

find that failing to disclose the Commonwealth's intervention in Olbinsky's pending case in Oregon--evidenced by the Oregon prosecutor's notes, the tape of the Oregon proceedings, and the fact that Olbinsky ultimately escaped with a slap on the wrist for a serious drug crime--prejudiced Jackson and rendered his trial unfair. But "[w]e do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." United States v. Dumas, 207 F.3d 11, 15 (1st Cir. 2000) (second alteration in original) (quoting Giglio, 405 U.S. at 154); see United States v. Flores-Rivera, 787 F.3d 1, 17 (1st Cir. 2015). And that is precisely what the SJC reasonably found this evidence to be, in light of the fact that Olbinsky's account of the crime did not change between the time he first contacted the authorities and the time he allegedly received favorable treatment for his testimony. Jackson IV, 9 N.E.3d at 848 (citing Commonwealth v. LaVelle, 605 N.E.2d 852, 857 (Mass. 1993)). That finding was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court precedent. See Perkins, 586 F.3d at 119 (citing 28 U.S.C. § 2254(d)(1)).

Finally, Jackson argues that the evidence clearly shows that the Commonwealth never intended to prosecute Olbinsky for first degree murder. Addressing this argument calls for defining

- 22 -

precisely what the argument is.  Jackson learned that <u>after</u> his trial the case against Olbinsky was dismissed without serious opposition by the government.  Nothing in <u>Brady</u>, though, requires prosecutors to do the impossible:  to disclose future events that have not yet occurred.  So Jackson must be arguing that the new information about what the government did after trial implies other information that existed prior to or during trial, yet was itself not disclosed.

Were that the case--that is to say, were it true that there existed material exculpatory or impeaching information before or during trial that was not disclosed--Jackson would have something to talk about.  All he has, though, is Olbinsky's bail agreement and his surmise and speculation that there was a deal with Olbinsky to later drop the charge.  This surmise and speculation was enough to get Jackson discovery and a return trip to the SJC.  Nothing in this record, though, leads us to conclude that the Massachusetts courts erred in remaining unconvinced that Olbinsky testified subject to a deal with prosecutors.  And if there was no deal, then there was nothing about a deal to disclose. Nor can Jackson say that he should have nevertheless been able to try out this "implied deal theory" on the jury.  As we have already noted, the implication arises from a post-trial occurrence that obviously could not have been disclosed to jurors.

So, too, goes Jackson's alternative theory that the post-trial dismissal of the murder charge against Olbinsky suggests that, before or during Jackson's trial, prosecutors had no intention to press the pending charge against Olbinsky. This theory fails unless, for starters, it was unreasonable for the SJC not to find that such an intent existed. The record evidence does not compel that conclusion. Moreover, Jackson points us to no clearly established federal law requiring prosecutors to disclose their unilaterally held, present intentions for future dealings with witnesses in a case.

To the extent Jackson instead claims that Olbinsky faced a bona fide murder charge but knew that it was likely to be dismissed if he cooperated with prosecutors, Jackson's counsel had all he needed at the trial to make that argument, and did so. Even after developing the record through the course of direct and collateral review, only post-hoc, speculative inferences support Jackson's claim that a deal between Olbinsky and the Commonwealth existed. Nothing in this record leads us to conclude that the Massachusetts courts erred in remaining unconvinced that there was a deal with Olbinsky. The SJC's decision to reject Jackson's <u>Brady</u> challenge did not contravene or misapply Supreme Court precedent, and was not contrary to the evidence in the record.

## c.

Finally, Jackson asks that he be allowed to supplement the record in an evidentiary hearing.  To qualify for a hearing under § 2254(e)(2), a petitioner for habeas relief must go one of two routes.  First, if the petitioner exhausted his claim but the state court did not adjudicate it on the merits, he may be granted an evidentiary hearing in the course of our de novo review of his claim.  See Atkins v. Clarke, 642 F.3d 47, 49 (1st Cir. 2011). Second, if the petitioner's claim was adjudicated on the merits in state court and the petitioner can successfully show that his claim has merit under § 2254(d), he may be granted an evidentiary hearing before we determine whether there was structural error or actual prejudice.  See Sanchez v. Roden, 808 F.3d 85, 89 (1st Cir. 2015). If the state court does adjudicate a petitioner's claims on the merits, and he cannot clear the hurdle of § 2254(d) based on the record that was before the state court, an evidentiary hearing under § 2254(e) is not allowed.  See Cullen v. Pinholster, 563 U.S. 170, 185 (2011).  "We review the district court's refusal to hold an evidentiary hearing for abuse of discretion."  Companonio v. O'Brien, 672 F.3d 101, 112 (1st Cir. 2012) (citing Forsyth v. Spencer, 595 F.3d 81, 85 (1st Cir. 2010)).

The district court correctly found that Jackson failed to "overcome the limitation of § 2254(d)(1) on the record that was before the state court."  Atkins, 642 F.3d at 49 (quoting Cullen,

563 U.S. at 185).  Thus, the "very limited circumstances" in which the state court record should be supplemented in federal court, Sivo v. Wall, 644 F.3d 46, 51 (1st Cir. 2011), are not present here.

### III.  Conclusion

What never emerged from the information produced by the Commonwealth or from the formal and informal discovery Jackson conducted was any direct evidence that the Commonwealth ever promised Olbinsky anything.  At best, Jackson is left to argue that because prosecutors in the Commonwealth and Oregon went easy on Olbinsky, and because Oregon prosecutors were asked to treat him "nicely," the Commonwealth must have so promised.  Nothing here, though, compels such an inference, or otherwise renders unreasonable the contrary view of the SJC in its application of legal rules well aligned with the requirements of federal constitutional law.  For this basic reason, Jackson's request for habeas relief fails.

We affirm the decision of the district court.  Jackson's petition for habeas corpus is denied.