# United States Court of Appeals
## For the First Circuit

No. 16-2277

BRYAN R. JOHNSTON,

Petitioner, Appellant,

v.

LISA A. MITCHELL,
Superintendent, Old Colony Correctional Center,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Selya, and Kayatta,
Circuit Judges.

David J. Nathanson, with whom Eva G. Jellison and Wood &
Nathanson, LLP were on brief, for appellant.
Jennifer K. Zalnasky, Assistant Attorney General, Criminal
Appeals Division, with whom Maura Healey, Attorney General of
Massachusetts, was on brief, for appellee.

September 8, 2017

**KAYATTA**, <u>Circuit Judge</u>.   After he was convicted of first degree murder in Massachusetts Superior Court, Bryan R. Johnston took a collateral challenge to the Massachusetts Supreme Judicial Court (SJC), arguing that his counsel rendered constitutionally ineffective assistance at trial.   The SJC affirmed Johnston's conviction, and the United States District Court for the District of Massachusetts denied his subsequent petition for a writ of habeas corpus under 28 U.S.C. § 2254.   On appeal, Johnston again argues that trial counsel made objectively unreasonable decisions at trial that ultimately led to Johnston's conviction.  He contends that trial counsel should have moved to suppress statements Johnston made during psychiatric evaluations conducted in jail and at a hospital after he was arrested and requested a lawyer.   He also contends that trial counsel should have made an effort to prevent the jury from hearing about the various times that Johnston asked to speak to his attorney while he was in custody.   For the following reasons, we affirm.

## I.   Background

The SJC's opinion describes the largely undisputed facts of this case.   See <u>Commonwealth</u> v. <u>Johnston</u> (<u>Johnston I</u>), 7 N.E.3d 424, 429-34 (Mass. 2014).   We draw heavily from that account, adding only the facts necessary to understand the contours of this appeal.

During a telephone call late in the evening of December 6, 2004, Johnston had an argument with David Sullivan, a friend from high school with whom Johnston had remained close. Id. at 429. Soon after the telephone call ended, Johnston drove thirty-one miles from his home in Westfield, Massachusetts, to Sullivan's home in Amherst, where Johnston shot Sullivan six times, killing him. Id.

Driving back to Westfield early in the morning of December 7, 2004, Johnston stopped in a swampy, wooded area near a restaurant to dispose of the rifle he used to kill Sullivan. Id. at 430. Leaving the site, he drove over a log that immobilized his vehicle. Id. When a snowplow driver stopped to help him, Johnston told the driver that because he had been drinking, he did not want to call the police for assistance. Id. Their efforts to move the car failed, and the snowplow driver left. Id. A short time later, two police officers who had been dispatched to the area of the restaurant saw the disabled vehicle and stopped. Id. Johnston approached them to ask for help. Id. Johnston told the officers that "he had come from a friend's house and had stopped to urinate." Id. The officers observed that Johnston's eyes were glassy and bloodshot and that he smelled lightly of alcohol, so they asked whether he had been drinking. Id. He admitted he had, but claimed he had stopped drinking much earlier in the evening and was "fine" at that time. Id.

- 3 -

The officers asked Johnston to perform field sobriety tests, but Johnston declined because he had heard from a college professor that field sobriety tests were illegal. Id. The officers explained that Johnston would not be arrested, but that he would not be allowed to drive away without demonstrating that he could safely operate the vehicle. Id. After Johnston took one sobriety test, the officers determined he was too impaired to drive safely. Id. Johnston's car was towed and he was allowed to telephone a friend to drive him home, which Johnston calmly and collectedly did. Id. Riding with the friend who picked him up, Johnston told his friend he was relieved he had not been searched, because, as he showed his friend, he was carrying a handgun despite the fact that his license to carry had been revoked. Id.

Upon returning home, Johnston called his parents, who would later testify that he was "making no sense, talking about the mafia and gangs, and threatening to commit suicide." Id. at 433. An hour later, he spoke on the telephone with his sister, who later stated that he made "no sense" during the call. Id. Johnston's parents came to see him in the morning of December 7 and found that his eyes were unfocused and that he was saying "bizarre" things. Id. Johnston's parents initiated civil commitment proceedings against him, and police officers served the commitment order on him later that morning. Id. at 430, 433. Johnston refused to comply, struggled, and was eventually subdued

- 4 -

by the officers before being taken into protective custody on December 7, 2004.  Id. at 431.

On December 9, 2004, police found the murder weapon in the woods with Johnston's fingerprints on it, and they discovered Sullivan's DNA on a pair of Johnston's pants.  Id.  Johnston was placed under arrest for the murder.  At the Hampshire County House of Correction, Johnston "refused to answer questions on advice of counsel" during a medical intake procedure.  Id. at 435.  The following day, the sheriff directed Dr. Michael Sherry to conduct an examination to determine whether Johnston should be committed for observation pursuant to section 18(a) of Massachusetts General Laws chapter 123.[1]  Id.  Johnston's counsel was present for the

---

[1] Section 18(a) provides, in pertinent part, that:

> If the person in charge of any place of detention within the commonwealth has reason to believe that a person confined therein is in need of hospitalization by reason of mental illness at a facility of the department or at the Bridgewater state hospital, he shall cause such prisoner to be examined at such place of detention by a physician or psychologist, designated by the department as qualified to perform such examination.  Said physician or psychologist shall report the results of the examination to the district court which has jurisdiction over the place of detention or, if the prisoner is awaiting trial, to the court which has jurisdiction of the criminal case.  Such report shall include an opinion, with reasons therefore, as to whether such hospitalization is actually required.  The court which receives such report may order the prisoner to be taken to a facility or, if a male, to the Bridgewater state hospital to be

examination.  Id.  Dr. Sherry determined that Johnston needed to be hospitalized because he was in danger of harming himself.  Id. A petition was therefore filed in court seeking Johnston's thirty-day commitment to Bridgewater State Hospital (Bridgewater).  Id.; see Mass. Gen. Laws ch. 123, § 18(a).  A judge approved the order the same day.  Johnston I, 7 N.E.3d at 435.  Over the weeks that followed, Johnston was approached numerous times by medical personnel who asked him questions about his mental state.  Id. at 436.  Medical staff made notes about these conversations, most of which showed Johnston repeatedly and frequently stating that he did not wish to respond until he could speak to his lawyer.  Id. at n.3.

At trial, Johnston's sole defense was lack of criminal responsibility.  Id. at 431.  The evidence at trial showed that he was a regular user of drugs and alcohol.  Id.  It also showed that he began experiencing hallucinations and delusions while attending college in Hawaii, during which time he reported to his family that he was being followed, surveilled, and stalked.  Id.  He feared the "mafia" and the Federal Bureau of Investigation, both of which he thought were after him.  Id. at 431-32.  He began taking steroids so that he would grow strong enough to protect

----

received for examination and observation for a period not to exceed thirty days.

Mass. Gen. Laws ch. 123, § 18(a).

himself and his family.  Id. at 432.  Fearing that the mafia was pursuing him, he abandoned his studies in Hawaii and enrolled at a college in Massachusetts in 2002.  Id.  "His professors recalled him as being friendly, highly competent, intelligent, and well respected by his peers.  They did not observe any unusual behavior or comments."  Id.  Meanwhile, at one point in the fall of 2002, Johnston walked into a police department and, in a panic, reported he was being chased.  Id.  Later, when Sullivan extended an offer to become roommates, Johnston declined because he was concerned that Sullivan was "a crime family boss" and that many of their friends were also involved with organized crime.  Id.  Johnston believed that Sullivan had threatened him and also claimed to believe that Sullivan's crime family had arranged to have Johnston sexually assaulted while he had been living in Hawaii.  Id.

Johnston presented at trial the expert testimony of a psychologist, Dr. Carol Feldman, and a psychiatrist, Dr. Martin Kelly.  Id. at 433.  Dr. Feldman opined that Johnston was suffering from paranoid schizophrenia at the time of the killing and was deluded into believing he was being persecuted by the victim and others.  She determined that Johnston "experienced hallucinations in which he heard voices of people intending to kill him, and delusions of being subjected to surveillance."  Id.  Dr. Kelly opined that Johnston suffered from a paranoid delusional disorder.  Id.  This disorder would not be "characterized by a decline in

functioning, which explains his capacity to work . . . and attend college." Id. Dr. Kelly also testified that drug and alcohol use were not the cause of Johnston's delusions. Id. at 433-34. The Commonwealth offered an expert in rebuttal, Dr. Michael Welner, a psychiatrist who opined that Johnston was likely not schizophrenic and likely did not suffer from paranoid delusional disorder. Id. at 434. Rather, Dr. Welner said, Johnston's hallucinations likely originated from his drug use. Id.

The jury convicted Johnston of first degree murder, armed burglary, possession of a large capacity firearm in the commission of a felony, and possession of a large capacity firearm without a license. Id. at 429. He appealed to the SJC and moved for a new trial. Johnston's new trial motion was denied without an evidentiary hearing, and his appeal of the denial was consolidated with his direct appeal. Id. The SJC rejected all of Johnston's claims on appeal, including his claims that he received ineffective assistance of counsel. Id. Johnston proceeded to the United States District Court for the District of Massachusetts in search of a writ of habeas corpus, which was denied. See Johnston v. Mitchell (Johnston II), 213 F. Supp. 3d 282, 285 (D. Mass. 2016). This timely appeal followed.

## II. Discussion

On appeal, Johnston seeks habeas relief based on two ineffective-assistance-of-counsel claims. First, he argues that

- 8 -

trial counsel should have moved to suppress evidence stemming from the conversations Johnston had with mental health professionals while in jail and while committed at Bridgewater, after he had refused multiple times to speak without counsel present. Second, Johnston contends that trial counsel should have prevented the jury from considering evidence that Johnston repeatedly requested to speak with his attorney. Johnston presented both of these arguments to the district court, and both were rejected. Id. The district court also issued a certificate of appealability, 28 U.S.C. § 2253(c), and Johnston filed this appeal. We review the district court's denial of Johnston's petition for habeas relief de novo. See Tran v. Roden, 847 F.3d 44, 50 (1st Cir. 2017).

**A.**

**1.**

"[T]he Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination require[s] that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." Edwards v. Arizona, 451 U.S. 477, 481–82 (1981) (citing Miranda v. Arizona, 384 U.S. 436, 479 (1966)). "If the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the interrogation must cease until an attorney is present.'" Id. at 482 (quoting Miranda, 384 U.S. at 474). "[I]t is inconsistent

with _Miranda_ and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." _Id._ at 485.  Once the right to counsel under the Fifth Amendment is invoked, custodial interrogation of a putative defendant may not resume without a lawyer present, even if the putative defendant has consulted with an attorney in the interim.  _See_ _Minnick_ v. _Mississippi_, 498 U.S. 146, 153 (1990).  The remedy for a violation of these prophylactic rules, in the ordinary case, is the exclusion of evidence impermissibly gathered as a result of the violation.  _See_ _Oregon_ v. _Elstad_, 470 U.S. 298, 306-07 (1985); _cf._ _Harris_ v. _New York_, 401 U.S. 222, 224-26 (1971) (evidence obtained in violation of _Miranda_ is admissible for impeachment purposes).

Johnston contends that the rules sculpted in _Miranda_, _Edwards_, and _Minnick_ were violated when, after he refused to answer questions during his medical intake at the county jail, he was subsequently subjected to questioning and psychiatric evaluation by mental health professionals at Bridgewater without counsel present.  He relies heavily on _Estelle_ v. _Smith_, 451 U.S. 454, 467 (1981), in which the Supreme Court held that a defendant's statements given in a court-ordered psychiatric evaluation could not be considered as evidence of future dangerousness at sentencing because the defendant was not made aware of his Fifth Amendment _Miranda_ rights prior to questioning.  Johnston argues that his

- 10 -

invocation of one of those Fifth Amendment rights secured by Miranda--the right to receive counsel before being questioned--rendered any subsequent statements made by him without counsel inadmissible. He therefore argues that his attorney should have moved to suppress all of the records produced at Bridgewater except for those of interviews conducted with counsel present. By failing to do so, says Johnston, trial counsel rendered unconstitutionally ineffective assistance under Strickland v. Washington, 466 U.S. 668 (1984). In other words, "counsel's representation fell below an objective standard of reasonableness and . . . there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012).

Johnston mounted the same challenge before the SJC. Citing Edwards, Minnick, and Estelle's discussions of a putative defendant's Fifth Amendment right to counsel, he argued that his responses to medical questions after refusing to answer questions without counsel present should have been excluded from trial. Instead, his own trial counsel "moved [for] the admission of the entire Bridgewater record." The prosecution used Johnston's statements to Bridgewater staff to "bolster[] the Commonwealth's position that Johnston['s] functioning was unimpaired" and to counter his defense based on mental illness. Specifically, Johnston complained to the SJC that the jury was permitted to

consider statements he gave to medical staff in which he denied having hallucinations when asked on December 11, December 17, and December 18, 2004. Johnston also pointed to records stating that during a medical examination on December 20, 2004, he denied any history of sexual abuse. These statements, along with others admitted at trial, directly undermined Johnston's experts' testimonies that he suffered from hallucinations and irrationally feared that he had been raped in Hawaii at the victim's direction.

The SJC found that Johnston's counsel was not ineffective for failing to seek suppression.[2] The court's explanation for its holding, however, characterized the nested claim in Johnston's ineffective-assistance claim as a Sixth Amendment right-to-counsel claim rather than the Fifth Amendment right-to-counsel claim actually asserted. Indeed, the court explicitly found that "what [was] not being argued" was "that [Johnston] invoked his right to remain silent." Johnston I, 7 N.E.3d at 435–36. Rather, said the SJC, Johnston's argument was "focuse[d] on the right to counsel under the Sixth Amendment to the United States Constitution, which attached at the time of his arraignment on the complaint that issued in the District Court."

---

[2] The SJC applied the standard articulated in Commonwealth v. Comita, 803 N.E.2d 700, 703 (Mass. 2004) (citing Commonwealth v. Saferian, 315 N.E.2d 878 (Mass. 1974)), which we have found to be "the functional equivalent of the federal Strickland standard." Powell v. Tompkins, 783 F.3d 332, 349 n.12 (1st Cir. 2015).

- 12 -

Id. at 436. Finding that Johnston's pre-arraignment psychiatric evaluations were not critical stages of his criminal proceeding, the SJC held that Johnston "had no Sixth Amendment right that required hospital staff to refrain from interviewing him or to terminate interviews with him until counsel was present." Id. It accordingly found that a suppression motion "based on an alleged violation of the defendant's Sixth Amendment right to counsel[] would not have succeeded," so trial counsel did not provide ineffective assistance by failing to file such a motion. Id.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, "we are typically required to accord substantial deference to a state court's decision on the merits." Jackson v. Marshall, 864 F.3d 1, 9 (1st Cir. 2017). If a claim was "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), we may grant habeas relief on that claim only if the state adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," Williams v. Taylor, 529 U.S. 362, 376 (2000) (opinion of Stevens, J.) (quoting 28 U.S.C. § 2254(d)(1)), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). "Only when a petitioner's claims are exhausted in state court but the state court fails to consider them on the merits or resolve them on

adequate and independent state law grounds do we review them de novo."  Jackson, 864 F.3d at 9 (citing Jenkins v. Bergeron, 824 F.3d 148, 152 (1st Cir. 2016)).

Johnston contends that this is one such situation.  He construes the SJC's missive that "what [was] not being argued . . . [was] that he invoked his right to remain silent" to mean that the SJC refused to consider the Fifth Amendment grounds that would have supported a suppression motion.  Johnston I, 7 N.E.3d at 435–36.  Although Johnston acknowledges that we must presume, absent contrary indication, that a state court's adjudication is "on the merits," he notes that this presumption may be rebutted "when there is reason to think some other explanation for the state court's decision is more likely."  Harrington v. Richter, 562 U.S. 86, 99–100 (2011).  There is plenty of reason to think so here, says Johnston:  By affirmatively stating that Johnston was not arguing that counsel should have sought suppression under the Fifth Amendment, and instead evaluating only whether counsel should have sought suppression under the Sixth Amendment, the SJC was presented with Johnston's claim but failed to consider it.

Clearly appreciating and acknowledging the conduct of counsel that Johnston alleged to be ineffective assistance, the SJC stated:  "The defendant . . . claims that trial counsel was ineffective for failing to move to suppress all responses the defendant made to officers at the Hampshire County house of

correction . . . and at Bridgewater State Hospital . . . after invoking his right to assistance of counsel." Johnston I, 7 N.E.3d at 435. The SJC also clearly understood that Johnston was arguing that a motion to suppress would have succeeded because "assertion[] of his right to assistance of counsel . . . required hospital staff to refrain from talking to him." Id. at 436. Nevertheless, what the SJC seems not to have understood is Johnston's grounding of his argument in the standards of the Fifth, rather than the Sixth, Amendment. This misapprehension likely arose from Johnston's failure to mention the Fifth Amendment by name in his initial brief to the SJC, although he did rely primarily on Fifth Amendment cases such as Edwards and Minnick. See generally Estelle, 451 U.S. at 462, 469 (differentiating the Fifth Amendment right to counsel from the Sixth Amendment right to counsel).

Ultimately, we need not decide whether the SJC's apparent misapprehension of the precise argument being made to it means that it did not adjudicate Johnston's claim on the merits. Rather, we can assume such a failure, yet nevertheless affirm on de novo review because Johnston has not demonstrated that trial counsel's performance in failing to seek suppression of his statements to medical personnel on Fifth Amendment grounds was so deficient as to constitute a deprivation of his Sixth Amendment right to counsel.

- 15 -

**2.**

Where an ineffectiveness claim is based on counsel's decision not to file a suppression motion, the petitioner must demonstrate that a meritorious claim formed the basis of the proposed motion in order to establish deficient performance. See Lockhart v. Fretwell, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (citing Kimmelman v. Morrison, 477 U.S. 365, 382 (1986)); Long v. United States, 847 F.3d 916, 920 (7th Cir. 2017) (stating that a claimant can only show deficient performance under Strickland if he can prove a suppression motion would have been meritorious); Jaynes v. Mitchell, 824 F.3d 187, 196 (1st Cir. 2016) (Souter, J.) (stating that a claimant must show the claim underlying the proposed suppression motion is meritorious, but classifying this requirement as an aspect of the prejudice prong, rather than the deficient-performance prong, of Strickland); United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir. 2015) (same).

We begin with the state of the law as reasonable counsel would have perceived it. Even today, Johnston points to no federal or state court decision holding that a putative defendant's responses to doctors' mental-health questions posed after the invocation of the right to counsel must be excluded when the defendant puts his mental state or capacity directly at issue. See Vargas-De Jesús v. United States, 813 F.3d 414, 418 (1st Cir.

- 16 -

2016) (observing that a lack of favorable precedent is one factor that can undermine a showing of deficient performance). Johnston argues that Estelle, Edwards, and Minnick formed a framework within which any reasonably competent lawyer would think a suppression motion filed on these grounds had merit. But Edwards and Minnick provide only the baseline principles that, in the ordinary case, a defendant's statements should be excluded if solicited by police after the defendant makes an affirmative, unambiguous invocation of the Fifth Amendment right to counsel, see Edwards, 451 U.S. at 485, and that an intervening meeting between the defendant and his counsel does not sterilize statements given in subsequent interrogations where counsel is not present, see Minnick, 498 U.S. at 153-55. Neither case involved medical professionals asking questions aimed at evaluating whether the putative defendant is a danger to himself or others or requires medical treatment, and neither case provided that answers given to any and all questions asked after the invocation of a Miranda right must be excluded. Cf. Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (recognizing "'routine booking question' exception which exempts from Miranda's coverage questions to secure the 'biographical data necessary to complete booking or pretrial services'" (quoting United States v. Horton, 873 F.2d 180, 181 n.2 (8th Cir. 1989))).

Estelle, for its part, provides that a defendant is entitled, under the Fifth Amendment, to a Miranda warning before

speaking to a court-appointed psychiatrist if the prosecution seeks to admit the psychiatrist's testimony to demonstrate the defendant's future dangerousness. Estelle, 451 U.S. at 469. But the Court in Estelle expressly declined to address the propriety of admitting evidence gathered in a Miranda-violative psychiatric examination in cases where the defendant "attempts to introduce . . . psychiatric evidence." Id. at 468.

Johnston also argues that the D.C. Circuit's opinion in United States v. Hinckley, 672 F.2d 115 (D.C. Cir. 1982) (per curiam), abrogated on other grounds by Hudson v. Palmer, 468 U.S. 517 (1984), demonstrates that he had a meritorious Fifth Amendment claim. There, the defendant, John Hinckley, Jr., was arrested for attempting to assassinate President Ronald Reagan. Id. at 117. After being turned over to the FBI, he informed agents that he would not make any statement until he consulted with his attorney. Id. at 120. Later, and without Hinckley waiving the right he had invoked, two agents conducted a twenty-five-minute "background" interview in which they asked Hinckley questions about his background, his marital status, his educational and employment history, his medical problems, his history of psychiatric treatment, and his relationship with his family (among other things). Id. at 121. The district court granted suppression of the answers given to the agents' questions and of the testimonies of the agents as to Hinckley's demeanor during the interview, and

the D.C. Circuit affirmed. Id. at 119. The D.C. Circuit rejected the government's argument that because the agents should not have known their questions were reasonably likely to elicit an incriminating response from Hinckley, the interview was not a "custodial interrogation" under Rhode Island v. Innis, 446 U.S. 291 (1980). Hinckley, 672 F.2d at 124-25. The court observed that the "agents who conducted the 'background' interview of Hinckley would naturally have been aware of the likelihood that he would present an insanity defense," and "most details about an individual's background are relevant to a determination of sanity, [so] a systematic 'background' interview necessarily elicits responses that the prosecution might want to introduce at trial." Id. at 124-25.

Hinckley had nothing to say, however, about whether statements made to physicians in the wake of an unfulfilled request for counsel must be excluded even when the defendant introduces the testimony of a psychiatric expert who opines on the defendant's mental state. On that subject, the Supreme Court in Estelle acknowledged and distinguished, with no hint of disapproval, numerous opinions holding that it is not a Fifth Amendment violation to require a defendant "to submit to a sanity examination conducted by the prosecution's psychiatrist" if "the defendant asserts the insanity defense and introduces supporting psychiatric testimony," because the defendant's "silence may deprive the State

of the only effective means it has of controverting his proof on an issue that he interjected into the case."  451 U.S. at 465-66. And a few years after Hinckley was decided, the Supreme Court blessed the admission of a psychiatric report describing "general observations about the mental state of [a] petitioner."  Buchanan v. Kentucky, 483 U.S. 402, 423 (1987).  The Court in Buchanan distinguished Estelle by noting both that trial counsel joined in the motion requesting an examination and that "petitioner's entire defense strategy was to establish the 'mental status' defense of extreme emotional disturbance."  Id.  "In such circumstances," the Court explained, "with petitioner not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence."  Id.

The law of Massachusetts also suggested the difficulty of prevailing on the challenge Johnston contends counsel should have mounted.  In Blaisdell v. Commonwealth, the SJC determined that "a defendant who seeks to put in issue his statements as the basis of psychiatric expert opinion in his behalf opens to the State the opportunity to rebut such testimonial evidence in essentially the same way as if he himself had testified."  364 N.E.2d 191, 200 (Mass. 1977).  In Seng v. Commonwealth, the SJC indicated even less concern that a criminal defendant's Fifth Amendment right against self-incrimination is implicated in an examination "not directed to the ultimate issue to be decided--

- 20 -

whether the defendant is guilty of the crime," like an examination for competence rather than to assess criminal responsibility. 839 N.E.2d 283, 291 (Mass. 2005).

Since the conclusion of Johnston's trial, the Supreme Court has reaffirmed its holding in Buchanan that "where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal." Kansas v. Cheever, 134 S. Ct. 596, 601 (2013) (citing Buchanan, 483 U.S. at 408, 422). In Cheever, the Supreme Court found no Fifth Amendment violation where, to rebut the defendant's evidence that he lacked the mental capacity to commit the charged crime, the prosecution proffered evidence from a court-ordered psychological examination. Id. at 602–03.

Johnston seeks to distinguish Buchanan and Cheever by pointing out that the petitioner in Buchanan joined the motion for a psychiatric examination and did not proactively invoke his Miranda rights, while Cheever declined to decide whether the psychiatric examiner's statements went beyond merely rebutting the defendant's psychiatric evidence. Johnston also points out that the psychiatric evaluations in these cases were different in character from the intake procedures conducted and the questions asked during rounds while he was being observed at Bridgewater. It is true that neither Buchanan nor Cheever dealt with a precise

factual analogue to this case. But the point we make here is not that Cheever controls; after all, it was decided after Johnston's trial was completed. Rather, the point is that Cheever would not read as it does if the prior case law had offered strong support for the notion that the results of a psychiatric examination compelled without counsel present could not be offered by the government in a case in which a defendant mounted an insanity defense.

To some extent, Johnston's argument on this front boils down to the notion that a suppression motion would not have been frivolous, so his attorney had nothing to lose and everything to gain by taking a shot at it. But a lawyer's performance does not fall to the level of a Sixth Amendment violation under Strickland simply because the lawyer fails to pursue any and all nonfrivolous strategies. See Knowles v. Mirzayance, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every available nonfrivolous defense. Counsel also is not required to have a tactical reason--above and beyond a reasonable appraisal of a claim's dismal prospects for success--for recommending that a weak claim be dropped altogether." (citations omitted)). Rather, except perhaps in an unusual case presenting circumstances not present here, when defense counsel is faulted for having failed to file a motion to suppress, the failure may constitute ineffective assistance under Strickland only when "no competent attorney would

- 22 -

think a motion to suppress would have failed."  <u>Premo</u> v. <u>Moore</u>, 562 U.S. 115, 124 (2011).

Johnston cannot meet that test.  With nary an on-point case in support and plenty of signals from the state and federal courts pointing the other way, it was reasonable for trial counsel to conclude that a Fifth-Amendment-based suppression motion was highly likely to fail and thus was not worth bringing.  Johnston's ineffective-assistance claim therefore fails.[3]  <u>See</u> <u>United States</u> v. <u>Ortiz</u>, 146 F.3d 25, 28 (1st Cir. 1998) (finding counsel's conduct "well within the acceptable range of reasonable professional assistance" because counsel relied on precedent that led him to "reasonably believe[]" a suppression motion "would be of no benefit to his client").  And because we find that Johnston fails to establish deficient performance under <u>Strickland</u>, we need not proceed to consider whether he has established prejudice under <u>Strickland</u> on this first claim.

---

[3] The district court came to the same conclusion, but it did so on different grounds, finding that because the "medical interviews were not of a criminal-investigative nature," they "did not constitute 'interrogations' under the Fifth Amendment." <u>Johnston II</u>, 213 F. Supp. 3d at 292 (citing <u>Coble</u> v. <u>Quarterman</u>, 496 F.3d 430, 440 (5th Cir. 2007)).  While we need not and do not decide whether this finding was correct, the fact that the district court judge so concluded certainly supports the point that trial counsel (like the district court here) could have reasonably viewed a suppression motion as doomed to fail.

Johnston's second claim on appeal is narrower: He contends that he received ineffective assistance of trial counsel because his attorney failed to move to redact the Bridgewater medical records so that the jury would not see Johnston's numerous refusals to answer questions on advice of counsel and his requests that he be permitted to confer with counsel. According to Johnston, these references were prejudicial because they allowed the jury to draw an adverse inference that Johnston was withholding inculpatory evidence. Johnston concedes that the SJC adjudicated and rejected this Strickland claim on the merits, and he makes no claim that the SJC's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Hence, we consider only whether the SJC's conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1).

A meritorious Strickland claim requires a claimant to establish both deficient performance and prejudice. Prejudice under Strickland requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Porter v. McCollum, 558 U.S. 30, 38–39 (2009) (quoting Strickland, 466 U.S.

at 694). "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) (quoting Strickland, 466 U.S. at 694).

The SJC found that Johnston was not prejudiced by his counsel's failure to attempt to redact the Bridgewater records. It noted that "[t]he evidence of [Johnston's] refusals on advice of counsel and his request to confer with counsel played a minor role in the battle of experts on the question of criminal responsibility, with an enormous amount of personal history, conduct, and other material as ammunition for that battle." Johnston I, 7 N.E.3d at 439 (internal quotations omitted). The SJC observed that the jury was presented with evidence that Johnston "disposed of the murder weapon and cleverly avoided potential problems with the two Hadley police officers who were dispatched to the restaurant"; that his employer thought him highly competent and reliable in stressful situations; that faculty at his college thought him capable and observed no unusual behavior from him; that friends said that "he appeared normal when sober"; that he had never been hospitalized for psychosis before; and that the doctor who conducted his Massachusetts General Laws chapter 123, section 18(a) evaluation on January 6, 2005, testified that Johnston "did not show psychotic symptoms while at Bridgewater State Hospital." Johnston I, 7 N.E.3d at 438-39. The SJC also

recounted that the trial judge "forcefully instructed the jury that [Johnston's] refusals to answer questions on advice of counsel were 'appropriate,'" and that the jury "should 'not draw any adverse inference from the fact that somebody has been advised by their attorney not to answer questions,' 'either because of the advice or because actions were taken pursuant to the advice.'" Id. at 439.

On this record, we cannot conclude that the SJC's finding of no prejudice was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To the contrary, it seems perfectly reasonable to conclude that any jury that would find evidence of sanity in Johnston's assertion of his rights would certainly find more than ample evidence of sanity in the other testimony concerning Johnston's behavior and comments. Moreover, Johnston's theory in this case was not that he was never lucid and rational. Rather, it was that he episodically acted delusionally. The challenged evidence bore very little on that issue. AEDPA requires us to consider not whether we agree with the SJC's holding, but rather whether the SJC misconstrued or misapplied clearly established federal law in finding no prejudice to Johnston. From this deferential vantage point, we cannot say that it did.

### III.  Conclusion

For the most part, the SJC clearly understood and reasonably rejected Johnston's claims on the merits in a manner consistent with federal constitutional law.  To the extent that the SJC misapprehended Johnston's argument regarding his Fifth Amendment rights, Johnston suffered no prejudice because his Strickland argument pertaining to his questioning by mental health officials would not have prevailed.  For these reasons, we affirm.